# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| **JOHN DOE,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **Case No. 3:21-cv-00028** |
| ) | **Judge Aleta A. Trauger** |
| **WILLIAM LEE, in his capacity as** ) | |
| **Governor of the State of Tennessee;** ) | |
| **DAVID RAUSCH, in his capacity as** ) | |
| **Director of the Tennessee Bureau of** ) | |
| **Investigation; and TONY PARKER,** ) | |
| **in his capacity as Commissioner of the** ) | |
| **Tennessee Department of Correction,** ) | |
| ) | |
| **Defendants.** ) | |

## MEMORANDUM

John Doe has filed a Motion for Preliminary Injunction (Doc. No. 15), to which Governor William Lee ("Governor"), Tennessee Bureau of Investigation ("TBI") Director David Rausch ("Director"), and Tennessee Department of Correction ("TDOC") Commissioner Tony Parker ("Commissioner") have filed a Response (Doc. No. 22), and Doe has filed a Reply (Doc. No. 23). The Governor, Director, and Commissioner have filed a Motion to Dismiss (Doc. No. 24), to which Doe has filed a Response (Doc. No. 27), and the defendants have filed a Reply (Doc. No. 28). For the reasons set out herein, Doe's motion will be granted, and the defendants' motion will be granted in part and denied in part.

## I. BACKGROUND

This case is one of several involving the State of Tennessee's policy of requiring that individuals convicted of certain criminal offenses comply with the obligations associated with the state's sexual offender registration program, despite the fact that no such program or

obligations existed at the time that the individual committed his crime. Several opinions from U.S. District Courts in this state have found the application of that policy to be unlawful (or, as the procedural posture called for, *likely*[1] or *plausibly*[2] unlawful), on the ground that the State of Tennessee is constitutionally forbidden from increasing the punishment associated with a crime ex post facto—that is, after the crime has already been committed. *See, e.g.*, *Doe #1 v. Lee*, No. 3:16-CV-02862, 2021 WL 428967, at *41 (M.D. Tenn. Feb. 8, 2021) (Richardson, J.); *Jackson v. Rausch*, No. 3:19-CV-377, 2020 WL 7496528, at *4 (E.D. Tenn. Dec. 21, 2020) (Jordan, J.) *Reid v. Lee*, 476 F.Supp.3d 684, 708 (M.D. Tenn. 2020) (Trauger, J.); *Doe v. Rausch*, 461 F. Supp. 3d 747, 769 (E.D. Tenn. 2020) (Reeves, C.J.); *Doe v. Rausch*, 382 F. Supp. 3d 783, 799–800 (E.D. Tenn. 2019) (Phillips, J.). Given the fact that these issues have been repeatedly and expertly litigated, the court will not belabor the details here, but will provide a simple recitation of the issues involved and the details particular to this case.

## A. The Constitutional Prohibition on Ex Post Facto Punishments

Article I of the U.S. Constitution has two clauses known as the Ex Post Facto Clauses, one of which applies to the federal government and one to the states. U.S. Const., art I, §§ 9, cl.3, 10, cl. 1. The reference in this opinion to "the Ex Post Facto Clause" is to the state Clause, U.S. Const., art I, § 10, cl. 1, because it is the one relevant to this case. "Ex post facto law" is "a term of art" that, consistently with its "established meaning at the time of the framing," has been construed to refer to criminal, but not civil, laws that are retroactive in effect. *Cal. Dep't of Corr. v. Morales*, 514 U.S. 499, 504 (1995) (quoting *Collins v. Youngblood*, 497 U.S. 37, 43 (1990)). *But see Collins*, 497 U.S. at 41 (acknowledging that a literal reading of the language would reach all, not merely criminal, laws). In its most straightforward formulation, the Ex Post Facto Clause

---

[1] *See* Fed. R. Civ. P. 65.

[2] *See* Fed. R. Civ. P. 12(b)(6).

dictates that "[l]egislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts." *Collins*, 497 U.S. at 43. "Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed." *Weaver v. Graham*, 450 U.S. 24, 28–29 (1981) (citing *Dobbert v. Florida*, 432 U.S. 282, 298 (1977); *Kring v. Missouri*, 107 U.S. 221, 229 (1883); *Calder v. Bull*, 3 U.S. 386, 387 (1798)).

The Ex Post Facto Clause "forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer." *Lindsey v. Washington*, 301 U.S. 397, 401 (1937) (citing *Kring*, 107 U.S. at 228–29; *Thompson v. Utah*, 170 U.S. 343, 351 (1898); *In re Medley*, 134 U.S. 160, 171 (1890)). Because modern American legal systems impose a range of consequences associated with criminal convictions, some of which are independent of the formal, statutorily authorized sentence associated with the relevant crimes, courts have had to consider when a government-imposed consequence of conviction is, for constitutional purposes, a punishment and therefore can only be imposed prospectively. In light of this recurring problem, the Supreme Court's "cases 'have not attempted to precisely delimit the scope of'" the term "ex post facto law," "but have instead given it substance by an accretion of case law." *Peugh v. United States*, 569 U.S. 530, 538–39 (2013) (quoting *Dobbert*, 432 U.S. at 292); *see, e.g., id.* at 544 (holding that retroactive application of change in Sentencing Guidelines violated the Ex Post Facto Clause); *Lynce v. Mathis*, 519 U.S. 433, 446 (1997) (holding that retroactive cancellation of provisional early release credits violated the Ex Post Facto Clause); *Morales*, 514 U.S. at 514 (holding that retroactive application of law allowing for deferral of parole hearings did not violate the Ex Post Facto Clause); *Weaver*, 450

U.S. at 36 (holding that retroactive application of statute reducing availability of good time credits violated the Ex Post Facto Clause).

**B. Tennessee's Sexual Offender Registry and Restrictions on Registrants**

Prior to 1994, individuals in Tennessee convicted of sexual offenses faced formal consequences that were mostly similar to those borne by individuals convicted of similarly serious non-sexual offenses. There may have been unique collateral consequences for sexual offenses in some areas—such as in family law proceedings—and defendants convicted of sexual crimes may have suffered especially severe extralegal reputational harms in their communities. For the most part, however, the path of a person convicted of a sexual offense was a familiar one: he would be convicted and serve punishment, often in the form of incarceration, after which he might be paroled or, if not paroled, released when his sentence was completed. Then, if there were no other sentences or charges awaiting him related to other crimes, he would attempt to reintegrate into society.

In 1994, however, the Tennessee General Assembly, concerned with the potential actions of sexual offenders after they had served their sentences, adopted legislation requiring the TBI to "establish, maintain, and update a centralized record system of sexual offender registration and verification information." 1994 Tenn. Pub. Laws, ch. 976 § 7(a). The law required registration for all individuals convicted of any one of a number of identified sexual offenses, "unless the offender had been wholly released without supervision from incarceration, probation, or parole prior to January 1, 1995." *Doe v. Haslam*, No. 3:16-CV-02862, 2017 WL 5187117, at *1 (M.D. Tenn. Nov. 9, 2017) (Crenshaw, C.J.) (citing 1994 Tenn. Pub. Laws, ch. 976 § 3(2)–(3)). Accordingly, there existed a subset of defendants who were required to register based on crimes they committed before the registry was in place, namely: (1) convicted defendants who were still

4

in the process of incarceration, parole, or supervision for a crime committed prior to 1995; and (2) individuals who had been or would be charged with committing crimes prior to 1995 but who had not yet been convicted.

The initial registration system was relatively undemanding and mostly concerned with ensuring the accuracy of registry information. See 1994 Tenn. Pub. Laws, ch. 976 §§ 4–7. After ten years, a registrant could petition a court to order his removal from the registry, which the court would grant if it found the registrant had complied with the Act, was rehabilitated, and did not pose a threat to public safety. *Id.* § 8. There were no restrictions on where a registrant could live, work, or travel. *Doe*, 2017 WL 5187117 at *2. In the ensuing decades, however, the Tennessee General Assembly repeatedly returned to the sexual offender registration statutes to change whom they reached, what they required, whether particular offenders would be able to eventually be removed from the registry, and how much protection the registry system offered to registered offenders' privacy. Chief Judge Crenshaw of this district has recounted the statutes' long history of more than two dozen revisions in *Doe v. Haslam*, No. 3:16-CV-02862, 2017 WL 5187117, at *1 (M.D. Tenn. Nov. 9, 2017), and this court will refer to that opinion for the details. In short, Tennessee's sexual offender registration system progressed from a relatively simple system, dedicated to information gathering and tracking, into a far-reaching structure for regulating the conduct and lifestyles of registered sexual offenders after their punishments were complete and, in many cases, for the rest of their lives, regardless of whether they demonstrated any ongoing risk to the community. A detailed list of the most salient provisions of the current registration scheme, the Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification, and Tracking Act ("Act"), can be found in this court's opinion in *Reid v. Lee*, 476 F. Supp. 3d at 689–93.

**C. John Doe**

The plaintiff in this case has requested that he be permitted to pursue his claims under the pseudonym "John Doe" and has filed under seal a Declaration including various personal details relevant to his case and the pending motion. Whether Doe will, as a practical matter, be able to maintain his public anonymity as this litigation progresses is an open question. At this stage, however, the court will attempt to limit its discussion of his past and identity to the relevant details.

In 1987, Doe, then 20 years old, pleaded guilty to several offenses, including two counts of aggravated rape. Subsequent litigation related to his convictions reveals that, when Doe was prosecuted, the State of Tennessee took the position that Doe had not himself raped or otherwise had sexual contact with the victim, but that the victim was raped by a codefendant whom Doe aided and abetted. The defendants do not dispute that characterization. Doe was sentenced to serve sixty-five years in prison, and he was released on parole in 2003. He expects to remain on parole until the 2040s, at which point he will be close to eighty years old. He lives in Metropolitan Nashville-Davison County. (Doc. No. 11 ¶¶ 4–8.)

Although Tennessee had no sexual offender registry when Doe committed his crimes or when he pleaded guilty, subsequent enactments required him to register with TBI and comply with the conditions of the Act when he was released. In 2007, further amendments required him to be classified as a "violent sexual offender," rather than merely as a sexual offender. Absent a change in the law, Doe will continue to be required to register as a violent sexual offender and comply with the restrictions on registered offenders for the rest of his life. (*Id.* ¶¶ 1–3, 9–12.)

Doe states that he has complied with the conditions of his release, including participation in therapy and sexual offender treatment programs, and has complied with all of the relevant

requirements of the Act, since his 2003 release. For example, every March, June, September, and December, he must go to the TDOC's Probation and Parole Office to confirm his registry information. When he does so, he sets aside a full day, because he does not know how long the process will take. When he has interacted with TDOC's parole officers, he has, at times, sought clarification and guidance regarding what his registry status permits him to do. He says, however, that the guidance he has received has been inconsistent and contradictory, "because different parole officers can have different interpretations of the Tennessee Department of Correction's rules and policies related to sex offenders on parole." (*Id.* ¶¶ 7–13.)

Doe has two daughters, and he complains, in particular, about the way that his registry status has interfered with his ability to parent. The Act includes a number of restrictions specifically targeted at a registrant's proximity to children or areas in which children are often found, even if the registrant's victim was not a child and the registrant has no history of sexual interest in children. Most significantly, a registered offender is forbidden from knowingly

> [b]e[ing] upon or remain[ing] on the premises of any building or grounds of any [1] public school, [2] private or parochial school, [3] licensed day care center, [4] other child care facility, [5] public park, [6] playground, [7] recreation center or public athletic field available for use by the general public in this state when the offender has reason to believe children under eighteen (18) years of age are present.

Tenn. Code Ann. § 40-39-211(d)(1). If the offender's victim was an adult, there are exceptions for certain expressly enumerated parenting-related activities, but those exceptions are only available if the offender has obtained "written permission or a request from the school's principal or the facility's administrator." Tenn. Code Ann. § 40-39-211(d)(2)(B). A separate provision allows a registered offender to pick up and drop off his child if he has provided the relevant administrator with written notice—meaning that, although the administrator can deny permission for most purposes, he cannot prevent the offender from transporting his child to and from the

7

school or facility, as long as the offender leaves immediately and does not otherwise come onto the premises. Tenn. Code Ann. § 40-39-211(d)(2)(D).

As restrictive as those provisions are, they are more flexible than the version that a parole officer allegedly (and incorrectly) relayed to Doe. According to Doe:

> [O]ne parole officer told me I could not go to my older daughter's school under any circumstances, even if I had the required written permission. As a result, I did not take her to school or pick her up while she lived with me. I even had to find someone to pick her up from preschool once when she became violently ill. I have never attended any of her school events, including her cello concerts, basketball practices, track meets, school dances, parent-teacher meetings, or her graduation. I also stopped waiting with her at the bus stop before school. I feared how a parole officer might interpret my presence there, so to avoid that risk, I started watching my daughter get safely on the bus from a distance.

(Doc. No. 11 ¶ 14.)

As a registered offender, Doe is required to pay a $150 fee annually. Tenn. Code Ann. § 40-39-204(b)(1), (c). He says that, once, he fell behind on his payment, and his parole officer "threatened to 'lock [him] back up' if [he] did not find a way to pay it." (Doc. No. 11 ¶ 16.) Doe fears that if he is unable to pay the fee, he will be susceptible to both a finding of a parole violation and a prosecution for a felony violation of the Act. (*Id.*)

The Act requires that, "[w]hen the [Tennessee Department of Safety and Homeland Security] issues or renews a driver license or photo identification card to a sexual offender [or] violent sexual offender . . . , the driver license or photo identification card shall bear a designation sufficient to enable a law enforcement officer to identify the bearer of the license or card as a sexual offender [or] violent sexual offender." Tenn. Code Ann. § 55-50-353. As a result, any time that Doe is required to show someone his driver's license, he is, in effect, required to divulge his status on the sexual offender registry. He complains of the stigma associated with such a system. (Doc. No. 11 ¶ 17.) Doe is also included, along with his

photograph, in a public, searchable internet database of registered sexual offenders. According to Doe, people whom he encounters in his everyday life have often discovered his registry status and reacted negatively. (*Id.* ¶ 24.)

Since his release, Doe has found steady work in the field of industrial maintenance. He claims, however, that he has been overlooked for promotions and management opportunities because of his registry status. (*Id.* ¶ 18.) In early 2020, he had multiple favorable interviews for a new position, but he was not selected for the job after a background check "revealed [his] status on the sex offender registry (though not [his] 1987 convictions)." (*Id.* ¶ 19.)

Doe also complains of the Act's restrictions on where he can live. A registered offender may not

> knowingly establish a primary or secondary residence or any other living accommodation or knowingly accept employment within one thousand feet (1,000') of the property line of any [1] public school, [2] private or parochial school, [3] licensed day care center, [4] other child care facility, [5] public park, [6] playground, [7] recreation center, or [8] public athletic field available for use by the general public.

Tenn. Code Ann. § 40-39-211(a)(1).[3] Violating this restriction—like violating most provisions of the Act—is a Class E felony. Tenn. Code Ann. § 40-39-211(f). Doe's attempts to find housing that complies with the Act's requirements and is available to him have required "lengthy" searches, although he does presently have a home. (Doc. No. 11 ¶¶ 20, 22.) In addition to the formal restrictions of the Act, he faces obstacles in the form of landlords who simply do not wish to rent to a registered sexual offender. He has specifically discussed the matter with at least one landlord who rejected him and found that "most apartment buildings" will refuse to rent to him. (*Id.* ¶ 20.) Doe currently lives with his one-year-old daughter and her mother in a rental home in Madison, Tennessee, but he fears that that location, as well, will become untenable if neighbors

---

[3] There is an exception if the proximity exists solely because of the change in ownership of a property after the offender established the residence or began the job. Tenn. Code Ann. § 40-39-211(e).

learn about his registry status. In the past, he has been directly approached by neighbors, including one homeowner's association head, informing him that community members were uncomfortable with his presence. (*Id.* ¶ 21.)

Although the Act does not forbid Doe from using the internet or social media sites, he is required to provide TBI with a "complete listing of [his] electronic mail address information, including usernames, any social media accounts [he] uses or intends to use, instant message, other internet communication platforms or devices, and [his] username, screen name, or other method by which [he] accesses these accounts or websites." Tenn. Code Ann. § 40-39-203(i)(17). Doe complains that he finds this provision unclear and confusing, and this court, like other courts that have attempted to discern the meaning of the Act's internet reporting requirements, agrees: it is genuinely difficult to know what, exactly, a person is required to report based on the Act's language. *See, e.g.*, *Doe v. Rausch*, 461 F. Supp. 3d at 772; *Doe v. Haslam*, 2017 WL 5187117, at *17. Doe states that, "[d]ue to the hassle and confusion of complying with the electronic communication disclosures, [he] only use[s] an electronic mail address." (Doc. No. 11 ¶ 25.)

The Act restricts the international travel of registered offenders, see Tenn. Code Ann. § 40-39-204(h), but it does not contain any statutory restrictions on travel within the United States. As Doe points out, however, TDOC imposes certain special policies and conditions on parolees who are also subject to the Act, and those conditions include additional requirements associated with travel. (*See* Doc. No. 10-2 at 17 (TDOC policy setting forth additional requirements for parolees on the registry).) Doe describes his travel restrictions, as they have been explained by TDOC to him and as he has experienced them, as follows:

> As a registered "violent sexual offender" in Tennessee, I cannot travel outside of Tennessee for more than a day without the risk of violating the registry laws and

10

the specialized conditions of sex offender parole supervision. As a result, I no longer travel outside of Tennessee for more than a day. After my release on parole, I once traveled to New York and Florida with my family. Before leaving, I obtained the necessary travel permit, but no one at the local law enforcement office where I was visiting would sign it. This happened repeatedly during my trip, caused me great concern that I would face arrest or a parole violation when I returned home.

(Doc. No. 11 ¶ 26.) Doe states that, "[b]ecause of the risks associated with interstate travel for [him], [he is] unable to spend any significant time with [his] older daughter, because she now lives in North Carolina with [his] ex-wife." (*Id.* ¶ 27.)

Finally, Doe complains that he is barred from decorating the exterior of his home for holidays or from "participating at all in any holiday centered on children, such as Halloween." (*Id.* ¶ 28.) The court notes that a similar issue was raised by a plaintiff in another case challenging the application of the Act and that the defendants in that case conceded that the Act contained no such restriction. *See Reid*, 476 F. Supp. 3d at 694 & n.8.

## D. Doe's Lawsuit

On January 13, 2021, Doe sued the Governor, the Director, and the Commissioner regarding his continuing status as a registered violent sexual offender. (Doc. No. 1.) He pleaded five Counts, each pursuant to 42 U.S.C § 1983, for the deprivation of his constitutional rights: Count I is for violation of the Ex Post Facto Clause; Count II is for violation of his alleged constitutional right to work; Count III is for violation of the First Amendment arising out of the restrictions on his rights to communicate and associate with others; Count IV is for violation of his right to travel; and Count V is for violation of his constitutional rights as a parent. (*Id.* ¶¶ 101–27.) On January 20, 2021, Doe filed a Motion for Preliminary Injunction prohibiting any of the defendants from enforcing the Act against him. (Doc. No. 10 at 1.) He premises his request for preliminary relief solely on Count I, his Ex Post Facto Clause claim. (Doc. No. 12.) The

defendants oppose that motion, and, on March 19, 2021, they filed a Motion to Dismiss all of Doe's claims. (Doc. No. 24.)

## II. LEGAL STANDARD

### A. Rule 12(b)(6) Motion to Dismiss

In deciding a motion to dismiss for failure to state a claim under Rule 12(b)(6), the court will "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Directv, Inc. v. Treesh*, 487 F.3d 471, 476 (6th Cir. 2007); *Inge v. Rock Fin. Corp.*, 281 F.3d 613, 619 (6th Cir. 2002). The Federal Rules of Civil Procedure require only that a plaintiff provide "a short and plain statement of the claim that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley v. Gibson*, 355 U.S. 41, 47 (1957). The court must determine only whether "the claimant is entitled to offer evidence to support the claims," not whether the plaintiff can ultimately prove the facts alleged. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 511 (2002) (quoting *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974)).

The complaint's allegations, however, "must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). To establish the "facial plausibility" required to "unlock the doors of discovery," the plaintiff cannot rely on "legal conclusions" or "[t]hreadbare recitals of the elements of a cause of action," but, instead, the plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679; *Twombly*, 550 U.S. at 556.

12

## B. Motion for Preliminary Injunction

"Four factors determine when a court should grant a preliminary injunction: (1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T. v. Sumner Cty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019) (citing *Benisek v. Lamone*, 138 S. Ct. 1942, 1943–44 (2018); Wright & Miller, 11A Fed. Prac. & Proc. Civ. § 2948 (3d ed. & Supp. 2019)). The district court must "weigh the strength of the four factors against one another," with the qualification that irreparable harm is an "indispensable" requirement, without which there is "no need to grant relief *now* as opposed to at the end of the lawsuit." *Id.* (citing *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). "Although no one factor is controlling, a finding that there is simply no likelihood of success on the merits is usually fatal." *Gonzales v. Nat'l Bd. of Med. Examiners*, 225 F.3d 620, 625 (6th Cir. 2000) (citing *Mich. State AFL–CIO v. Miller*, 103 F.3d 1240, 1249 (6th Cir. 1997)).

## II. ANALYSIS

## A. Inclusion of the Governor as a Defendant

As a preliminary matter, the Governor argues that he is not an appropriate defendant in this case, because none of the specific duties imposed by the Act are carried out or enforced by his office, but rather by various other state and local officials with more specific responsibilities. As the Governor points out, he is, in his official capacity, generally entitled to sovereign immunity from suit unless that immunity is waived or abrogated. *See Motto v. Mullins*, No. 2:19-CV-0008-1DCLC-CRW, 2020 WL 2478275, at *2 (E.D. Tenn. May 13, 2020) ("[A]ny claims against Governor Lee in his official capacity are equivalent to claims against the State itself. Under the Eleventh Amendment, states have immunity from suit in federal court."). The

Supreme Court's *Ex parte Young* doctrine, however, "carves out an exception to" that immunity with regard to certain types of claims. *Children's Healthcare is a Legal Duty, Inc. v. Deters*, 92 F.3d 1412, 1414 (6th Cir. 1996). Under *Ex parte Young*,

> individuals who, as officers of the state, are clothed with some duty in regard to the enforcement of the laws of the state, and who threaten and are about to commence proceedings, either of a civil or criminal nature, to enforce against parties . . . an unconstitutional act, violating the Federal Constitution, may be enjoined by a Federal court of equity from such action.

209 U.S. 123, 155–56 (1908).

As the Governor points out, "[g]eneral authority to enforce the laws of the state is not sufficient to make government officials the proper parties to litigation challenging the law." *Deters*, 92 F.3d at 1416 (quoting *1st Westco Corp. v. School Dist. of Philadelphia*, 6 F.3d 108, 113 (3d Cir. 1993)). Rather, to pursue an *Ex parte Young* claim against a state official, the official must "have some connection with the enforcement" of the law whose constitutionality is in question. *Ex parte Young*, 209 U.S. at 157. Proper defendants to an *Ex parte Young* claim are typically those "officials who have direct responsibility in the area in which the plaintiff seeks relief." *Bartlett v. Wengler*, No. 1:12-CV-00312-EJL, 2014 WL 4773959, at *5 (D. Idaho Sept. 24, 2014); *see also Muhammad v. Crosby*, No. 4:05CV193-WS, 2008 WL 2229746, at *19 (N.D. Fla. May 29, 2008), *aff'd sub nom. Muhammad v. Sapp*, 388 F. App'x 892 (11th Cir. 2010) (holding that *Ex parte Young* claim is appropriately brought against "Defendants who currently have official capacity to provide a remedy through declaratory or injunctive relief").

The *Ex parte Young* doctrine becomes more complicated, however, when a plaintiff seeks to challenge a policy with diffuse enforcement responsibilities shared across multiple agencies and levels of government. The challenge at issue in this case is a good example. Certainly, the Director, in his capacity as the chief executive of the TBI, has substantial oversight power with

14

regard to the core activity of maintaining the sexual offender registry, and he could be enjoined from exercising that power in certain allegedly unconstitutional ways. The broad scheme of the Act, however, places enforcement and administration powers in far more hands than just the TBI's. For example, the Tennessee Department of Safety and Homeland Security provides the registrant's sexual offender-branded driver's license. If a registrant is perceived to have violated the Act, he will most likely be arrested by local law enforcement. Local prosecutors would prosecute him. The principal of a public school would be the party to deny the registrant access. None of these officials answer to the Director, and an injunction binding only the Director would have no direct force on them.

In other words, while the Act constitutes a single, comprehensive scheme, the responsibilities for carrying that scheme out are scattered throughout various agencies and levels of government, making it difficult to identify the appropriate target or targets for injunctive relief. The courts could interpret *Ex party Young* to require a plaintiff seeking effective relief in such a situation to name, as a defendant, the chief executive of every agency that could reasonably be foreseen to play a role in the enforcement of his challenged policy. The litigation that would ensue from such a rule would undoubtedly be complex, but the issue of diffuse enforcement responsibility, at least, would be solved. The Sixth Circuit, however, has recognized an alternative (or, if the plaintiff wishes to cover all of his bases, parallel) option. In *Allied Artists Picture Corp. v. Rhodes*, 679 F.2d 656 (6th Cir. 1982), the Sixth Circuit held that an *Ex parte Young* action may properly be brought against a governor to challenge an unconstitutional law, "[e]ven in the absence of specific state enforcement provisions," if "the substantial public interest in enforcing [the unconstitutional law] places a significant obligation upon the Governor to use his general authority to see that state laws are enforced." *Id.* at 665 & n.5. That rule

recognizes that, in at least some situations, the Governor's ultimate authority as the chief executive of the state renders him the appropriate subject of an injunction directed at a state policy that otherwise might not be entrusted to any single official but which the governor must ultimately oversee as the final arbiter of the executive policy of the state.

The Governor does not dispute that there is a "substantial public interest" in the enforcement of the state's policies regarding sexual offenders who have been released into the community. *See* Tenn. Code Ann. § 40-39-201(b)(1) (stating that the purposes of the Act are "of paramount public interest"). Nor does the Governor expressly dispute that, given the diffuse nature of the responsibilities set forth in the Act, he can and should use his general authority to see that the various officials with responsibilities under the Act execute the Act effectively. On its face, therefore, this situation meets the requirements set out in *Allied Artists*.

The court agrees that *Allied Artists* probably should not apply where the enforcement of the challenged law has been narrowly entrusted to a particular official or agency, such that there is no need to look to the Governor's general authority to see that the law is carried out in order to craft an effective injunction. *See LensCrafters, Inc. v. Sundquist*, 184 F. Supp. 2d 753 (M.D. Tenn. 2002) (Trauger, J.) (holding that *Allied Artists* did not apply because "there is a separate body, the Tennessee Board of Optometry, that has been clothed with exactly the enforcement responsibility" at issue in the challenge). The Act, however, does not present such a situation; while TBI and TDOC administer parts of the Act, much of the actual enforcement of the Act is entrusted to the numerous, diffuse local law enforcement entities of the state, with no single agency or official possessing the kind of singular authority that would render other defendants unnecessary. The court therefore concludes that the Governor is an appropriate defendant in this case pursuant to *Allied Artists* and will not dismiss the claims against him.

16

**B. Count I: Ex Post Facto Application of the Act**

1. Relationship Between the Two Pending Motions

There is considerable overlap between the court's consideration of the defendants' Motion to Dismiss, as it applies to Count I, and the court's evaluation of the first factor of the preliminary injunction inquiry, likelihood of success on the merits—with the important caveat that, while the court will assume that all of the assertions in Doe's Complaint are true for the purposes of the Rule 12(b)(6) motion, it must rely on evidence in the record regarding his request for preliminary relief. Because of this substantial overlap, the court will evaluate the issues together, with that caveat in mind.

2. Relevant Caselaw

The parties agree that the government may not "retroactively . . . increase the punishment for criminal acts." *Collins*, 497 U.S. at 43. It is also well-settled that this prohibition covers more than express changes to the particular statutory sentence associated with an offense. *Peugh v. United States*, 569 U.S. 530, 539 (2013) (noting that the Supreme Court has "never accepted the proposition that a law must increase the maximum sentence for which a defendant is eligible in order to violate the Ex Post Facto Clause.") (citing *Lindsey v. Washington*, 301 U.S. 397 (1937)). To the contrary, a state's "[s]ubtle ex post facto violation[]" is "no more permissible than [an] overt one[]." *Collins*, 497 U.S. at 46.

Nevertheless, the Supreme Court has held that a state's operation of a sexual offender registry that includes offenders whose crimes took place prior to the registry's adoption does not, in and of itself, amount to an Ex Post Facto Clause violation, because a simple registry, without additional harms and restrictions, is not inherently a mechanism of punishment. Specifically, in *Smith v. Doe*, 538 U.S. 84 (2003), the Supreme Court considered the constitutionality of the

17

retroactive application of an Alaska sexual offender law that consisted of "two components: a registration requirement and a notification system." *Id.* at 90. To determine whether the registry amounted to a retroactive punishment, the Court applied the standard it had established in *Kansas v. Hendricks*, 521 U.S. 346, 366 (1997), which had involved a challenge to a statute governing involuntary commitment of certain mentally ill sexual offenders:

> We must "ascertain whether the legislature meant the statute to establish 'civil' proceedings." If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is "so punitive either in purpose or effect as to negate [the State's] intention to deem it 'civil.'"

*Smith*, 538 U.S. at 92 (quoting *Hendricks*, 521 U.S. at 361). The Court added that, because a legislature is entitled to considerable deference when it states its purpose, "'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* (quoting *Hudson v. United States*, 522 U.S. 93, 100 (1997)). The Court concluded, based on the language of the Alaska statute, that the Alaska registry system was intended to be civil in nature, giving rise to a presumption that it was not punitive. *Id.* at 94–95.

The Court therefore turned to the question of whether the Alaska statute had a punitive purpose or effect. The Court concluded that its analysis should be guided by the factors related to the punitive character of a statute set forth in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963):

> [1] Whether the sanction involves an affirmative disability or restraint, [2] whether it has historically been regarded as a punishment, [3] whether it comes into play only on a finding of scienter, [4] whether its operation will promote the traditional aims of punishment—retribution and deterrence, [5] whether the behavior to which it applies is already a crime, [6] whether an alternative purpose to which it may rationally be connected is assignable for it, and [7] whether it appears excessive in relation to the alternative purpose assigned.

18

*Id.* at 168–69 (internal footnotes omitted). Particularly relevant, the Court wrote, were the questions of whether the challenged regulation "has been regarded in our history and traditions as a punishment; imposes an affirmative disability or restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Smith*, 538 U.S. at 97.

Based on those factors, the Supreme Court concluded that the Alaska registration system was not punitive in character. Among the grounds for its conclusion was that the Alaska law "impose[d] no physical restraint." *Smith*, 538 U.S. at 100. The Court also noted that, unlike with criminal regimes such as probation, "offenders subject to the Alaska statute are free to move where they wish and to live and work as other citizens, with no supervision." *Id.* at 101. With regard to the lifelong duration of the reporting requirements for some offenders, the Court concluded it was not excessive, citing "[e]mpirical research" on recidivism among child molestors. *Id.* at 104.

A few years later, in *Doe v. Bredesen*, 507 F.3d 998 (6th Cir. 2007), the Sixth Circuit considered the application of the Ex Post Facto Clause to the version of the Tennessee registration regime in force at the time. As *Smith* requires, the court looked first to whether the Tennessee General Assembly had expressly designated the law as civil or whether it had declared some punitive intent. The Act, then as now, included provisions stating that the purpose of the Act is public safety, that the Act "shall not be construed as punitive," and that "the general assembly does not intend that the information be used to inflict retribution or additional punishment on those offenders." Tenn. Code Ann. § 40-39-201(6), (8). The court therefore turned to the second part of the *Smith* inquiry, whether the punitive purpose or effect of the Act was sufficient to overcome the stated legislative intention. *Doe*, 507 F.3d at 1004. Relying on the

19

multi-factor *Mendoza-Martinez* test, the court concluded that the Act was not punitive. The court noted, in particular, that "registration, reporting, and surveillance components are not of a type that we have traditionally considered as a punishment" and that the Act does not "prevent [a registered offender] from changing jobs or residences or traveling to the extent otherwise permitted by their conditions of parole or probation."[4] *Id.* at 1005.

Meanwhile, the Tennessee General Assembly continued its pattern of expanding the requirements of the registration regime by amendment, particularly with regard to restrictions related to children, regardless of the age of the offender's victim. For example, restrictions about entering schools, playgrounds and other facilities were added in 2008. *See* 2008 Tenn. Pub. Acts, ch. 1164, § 11. Restrictions related to libraries were added in 2011. *See* 2011 Tenn. Pub. Acts, ch. 287. The Act's residence restrictions regarding schools and other facilities were extended to offenders whose victims were adults in 2014. *See* 2014 Tenn. Pub. Acts, ch. 992, § 1. The prohibition on being alone with children other than one's own in a "private area" were added in 2015. *See* 2015 Tenn. Pub. Acts, ch. 516.

In 2016, the Sixth Circuit considered the issue of retroactive application of registration laws anew in *Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016). That case involved Michigan's sexual offender registration system, which, the court wrote, "began in 1994 as a non-public registry maintained solely for law enforcement use" but "ha[d] grown into a byzantine code

---

[4] The Act did, in fact, restrict where a registered offender could live or work, which had been discussed at length at the district court level. The district court, consistently with the law, concluded that the Act did not restrict the ability to move or change jobs, but rather that, "[w]hile provisions of the Act restrict sexual offenders from establishing a residence or employment within a certain radius of schools or child care facilities, offenders do not *need permission* to move or change jobs and are free to live and work *away from those restricted areas*." *Doe v. Bredesen*, No. 3:04-CV-566, 2006 WL 849849, at *8 n.5 (E.D. Tenn. Mar. 28, 2006) (emphasis added). The court construes the Sixth Circuit's opinion as making the same point rather than suggesting that changing jobs or residences was not impeded to any extent.

governing in minute detail the lives of the state's sex offenders." *Id.* at 697. The court recounted

a history of amendments strikingly similar, though not identical, to Tennessee's:

> Over the first decade or so of SORA's[5] existence, most of the changes centered on the role played by the registry itself. In 1999, for example, the legislature added the requirement that sex offenders register in person (either quarterly or annually, depending on the offense) and made the registry available online, providing the public with a list of all registered sex offenders' names, addresses, biometric data, and, since 2004, photographs. *See* Mich. Pub. Act. 85 §§ 5a(4), 8(2), 10(2)(3) (1999); Mich. Pub. Acts 237, 238 (2004). Michigan began taking a more aggressive tack in 2006, however, when it amended SORA to prohibit registrants (with a few exceptions, *see* Mich. Comp. Laws § 28.734–36) from living, working, or "loitering" within 1,000 feet of a school. *See* Mich. Pub. Acts 121, 127 (2005). In 2011, the legislature added the requirement that registrants be divided into three tiers, which ostensibly correlate to current dangerousness, but which are based, not on individual assessments, but solely on the crime of conviction. *See* Mich. Pub. Acts 17, 18 (2011). The 2011 amendments also require all registrants to appear in person "immediately" to update information such as new vehicles or "internet identifiers" (e.g., a new email account). *See id.* The 2006 and 2011 amendments apply retroactively to all who were required to register under SORA. *See* Mich. Pub. Act 46 (2006); Mich. Pub. Acts 17, 18 (2011). Violations carry heavy criminal penalties. See Mich. Comp. Laws § 28.729.

*Snyde*r, 834 F.3d at 697–98. Five plaintiffs challenged the law on various grounds, including the

Ex Post Facto Clause. The case went to a bench trial, which permitted the development of a

significant factual record. The Sixth Circuit, based on that record, noted that the plaintiffs "had

trouble finding a home in which they c[ould] legally live or a job where they c[ould] legally

work" and "those Plaintiffs who ha[d] children (or grandchildren)" were prevented "from

watching them participate in school plays or on school sports teams" or from "visiting public

playgrounds with their children for fear of 'loitering.'" *Id.* at 698.

---

[5] "SORA" stands for "Sex Offender Registration Act," an acronym used for Michigan's Act and also used generically to refer to many states' acts, including often Tennessee's—even though that is not actually the present name for the Act.

The Sixth Circuit performed the first step of the *Smith* analysis and found—as courts typically do[6]—that the statute purported to be civil and non-punitive on its face. *Id.* at 700–01. The court then focused the second part of the *Smith* analysis on the five *Mendoza-Martinez* factors that *Smith* had identified as particularly salient in registry cases:

(1) Does the law inflict what has been regarded in our history and traditions as punishment?

(2) Does it impose an affirmative disability or restraint?

(3) Does it promote the traditional aims of punishment?

(4) Does it have a rational connection to a non-punitive purpose?

(5) Is it excessive with respect to this purpose?

*Id.* at 701 (citing *Smith*, 538 U.S. at 97.)

With regard to the first factor—history and tradition—the court noted that, although Michigan's act had "no direct ancestors in our history and traditions," it "resemble[d], in some respects at least, the ancient punishment of banishment" as well as "traditional shaming punishments." *Id.* at 701–02. The court cited evidence that vast swathes of the state's more populous areas were unavailable to the registrants for living or working, and the registrants were branded with derogatory classifications that did not reflect an individualized determination that the descriptor was justified. *Id.* The court also observed that life under the Michigan system, unlike life under the Alaska system upheld in *Smith*, "resembles the punishment of parole/probation." *Id.* at 703. The court explained:

registrants are subject to numerous restrictions on where they can live and work and, much like parolees, they must report in person, rather than by phone or mail.

---

[6] Indeed, it is difficult for this court to see how any retroactive law enacted or amended since *Smith* is likely to fail the first portion of the test, other than through legislative inadvertence. Any legislature that wishes its enactment to survive constitutional review knows that it can, while sacrificing nothing of the content of the statute, include a *pro forma* claim of civil intent and become eligible for deferential review under *Smith*.

Failure to comply can be punished by imprisonment, not unlike a revocation of parole. And while the level of individual supervision is less than is typical of parole or probation, the basic mechanism and effects have a great deal in common. In fact, many of the plaintiffs have averred that SORA's requirements are more intrusive and more difficult to comply with than those they faced when on probation.

*Id.*

The court also found that the second factor—affirmative disability and restraint—favored a finding of punitive effect, in light of the aforementioned restrictions on a registered offender's residence, work, and movement. The court observed that those restrictions amounted to "restraints . . . greater than those imposed by the Alaska statute [at issue in *Smith*] by an order of magnitude." *Id.* With regard to factor three—the traditional aims of punishment—the court concluded that the Michigan act

advances all the traditional aims of punishment: incapacitation, retribution, and specific and general deterrence. Its very goal is incapacitation insofar as it seeks to keep sex offenders away from opportunities to reoffend. It is retributive in that it looks back at the offense (and nothing else) in imposing its restrictions, and it marks registrants as ones who cannot be fully admitted into the community. Further, . . . it does so in ways that relate only tenuously to legitimate, non-punitive purposes. Finally, its professed purpose is to deter recidivism . . . , and it doubtless serves the purpose of general deterrence.

*Id.* at 704.

The last two factors—rational relationship to purpose and excessiveness—are closely related because they both consider the degree to which a law serves its stated civil purpose, as opposed to, for example, a desire for retribution or stigmatization appropriate only in the criminal context. The Sixth Circuit found that, based on the evidence in the record, the connection between the registration regime and its stated public safety purposes was weak. The court noted a study "suggest[ing] that sex offenders (a category that includes a great diversity of criminals, not just pedophiles) are actually *less* likely to recidivate than other sorts of criminals."

*Snyder*, 834 F.3d at 704 (citing Lawrence A. Greenfield, Recidivism of Sex Offenders Released from Prison in 1994 (2003)). "In fact," the court observed, "one statistical analysis in the record concluded that laws such as SORA actually *increase* the risk of recidivism, probably because they exacerbate risk factors for recidivism by making it hard for registrants to get and keep a job, find housing, and reintegrate into their communities." *Id.* at 704–05 (citing J.J. Prescott & Jonah E. Rockoff, *Do Sex offender Registration and Notification Laws Affect Criminal Behavior?,* 54 J.L. & Econ. 161, 161 (2011)). Likewise, with regard to excessiveness, the court observed that the Michigan law imposed a number of laborious requirements on offenders for which the actual public safety benefits were, at best, speculative, concluding that the "punitive effects of these blanket restrictions thus far exceed even a generous assessment of their salutary effects." *Id.* at 705.

The court accordingly found that the Michigan law was punitive in effect and could not be imposed retroactively. *Id.* (collecting similar holdings from other courts). The court forcefully explained:

> A regulatory regime that severely restricts where people can live, work, and "loiter," that categorizes them into tiers ostensibly corresponding to present dangerousness without any individualized assessment thereof, and that requires time-consuming and cumbersome in-person reporting, all supported by—at best—scant evidence that such restrictions serve the professed purpose of keeping Michigan communities safe, is something altogether different from and more troubling than Alaska's first-generation registry law. SORA brands registrants as moral lepers solely on the basis of a prior conviction. It consigns them to years, if not a lifetime, of existence on the margins, not only of society, but often, as the record in this case makes painfully evident, from their own families, with whom, due to school zone restrictions, they may not even live. It directly regulates where registrants may go in their daily lives and compels them to interrupt those lives with great frequency in order to appear in person before law enforcement to report even minor changes to their information.
>
> We conclude that Michigan's SORA imposes punishment.

*Id.* at 705.

### 3. Application of *Snyder* to this Case

As this court has previously observed, the similarities between Tennessee's registration system and Michigan's suggest that much of the analysis of *Snyder* could apply here. Similarly, this courts agrees, as it has before, with the other district court judges who concluded that Tennessee's registration scheme has been changed sufficiently since *Doe v. Bredesen* was decided that a court can apply *Snyder* to Tennessee's scheme without violating any earlier precedent. See, e.g., *Doe v. Haslam*, 2017 WL 5187117, at *19–20; *Doe v. Rausch*, 382 F. Supp. 3d at 788 (E.D. Tenn. 2019); *Doe v. Gwyn*, No. 3:17-CV-504, 2018 WL 1957788, at *7 n.6 (E.D. Tenn. Apr. 25, 2018).

Once one concludes that the court can consider Tennessee's law under *Snyder*, this becomes an easy case, at least with regard to whether the court should dismiss Count I. Virtually every observation that the Sixth Circuit made about the Michigan regime could be made about the Act with, at most, minimal tweaking. In terms of the multi-factor test, the Act, like Michigan's law, imposes a system that, in many ways, is simply a modern hybrid of the traditional punishments of banishment, shaming, and probation or parole. It places significant restrictions on a registrant's physical freedom in the world, including by restricting where he can live or work and whether he can enter his children's schools. Its consequences are harsh, and there exist significant questions about whether any purpose beyond retribution and punishment could justify those consequences. Based on his allegations, Doe is entitled to pursue discovery in an attempt to establish that Tennessee's system is just as faulty as Michigan's. The court, accordingly, will deny the motion to dismiss.

With regard to Doe's request for a preliminary injunction, the defendants argue that this court should not be persuaded by *Snyder* or by any of the now numerous district court decisions

concluding that the Act is punitive in character because such conclusions, according to the defendants, should be drawn narrowly and based solely on the individual circumstances of each individual plaintiff. (*See* Doc. No. 22 at 5 (citing *Doe v. Rausch*, 461 F. Supp. 3d at 769 (describing holding as "limited to this Plaintiff").) Of course, this is not a class action case, and Doe does not seek any relief, either preliminary or otherwise, for anyone but himself—meaning that this case, by definition, is limited to him. Regardless, however, the defendants' argument that analyses in this area must be overwhelmingly specific to the individual is simply impossible to reconcile with the governing law. The *Mendoza-Martinez* factors that the court is required to consider are chiefly focused on the nature of the enactment itself, not the circumstances of the individual plaintiff. There is, for example, nothing offender-specific about whether something "has historically been regarded as a punishment, whether it comes into play only on a finding of scienter, [or] whether the behavior to which it applies is already a crime." *Mendoza-Martinez,* 372 U.S. 144 at 168–69. Even the factors that might implicate some variation between offenders, such as the extent to which physical restraint is involved, raise, at most, offender-specific differences in severity that might bear on the weight of the factor, not the direction that the factor points in.

Moreover, even if one assumes that the punitive character of a law might vary from person to person in marginal cases, that principle undoubtedly would have its limits. No one, for example, seriously contests that the Ex Post Facto Clause forbids the government from retroactively imposing a definite prison sentence. Yet the court, from its many years of experience, can confirm anecdotally that there is considerable variation in how negatively individual prisoners experience incarceration. Some individuals even thrive in prison, often in stark contrast to the problems they experienced in their pre-incarceration lives. That does not

26

stop prison from being a punishment, as a constitutional matter. As the *Mendoza-Martinez* factors plainly account for, some legal consequences, in light of their nature, context, and social function, simply *are punishments*, regardless of any variation in the individual's subjective experience of that consequence.

Finally, the idea that the punitive character of an enactment depends entirely or even mostly on the individual circumstances of a prosecuted individual defies the logic of the very inquiry at issue here. The Ex Post Facto Clause, as it has long been interpreted, sets forth a clear command to a legislature: if the legislature wishes to enact a punitive law, it must do so prospectively. But if a law is prospective in nature, then the enacting legislature, by definition, does not know whom it will punish and therefore does not know how severely that punishment will fall on any particular individual. In other words, the Ex Post Facto Clause assumes that a legislature will be able to determine whether something is a punishment ahead of time, based on the character of the law itself. The court doubts that the Constitution would require that punishments be prospective, while simultaneously adopting a definition of "punishment" that makes it impossible to identify one prospectively.

In any event, even if the defendants are right that these cases must be decided on a purely individual basis, Doe has satisfied his burden in that regard here. He has presented evidence of the effects of the Act on his life, and those effects are significant. Moreover, the effects of many of the Act's provisions are simple enough for the court or anyone else to surmise based merely on an ordinary understanding of day-to-day life, which the court is not required to ignore.

As the defendants point out, there are admittedly some unresolved factual issues regarding the degree to which some of the treatment that Doe currently endures would continue, even if he were not on the registry, because he is on parole. While Doe has identified some

27

specific policies that TDOC imposes on him as a parolee who is also a registered offender, Doe does not ultimately dispute that his parole status affords TDOC considerable discretion with regard to how onerously it will supervise him, regardless of whether he remains on the registry. At most, however, this factor would bear on the amount of irreparable harm that Doe potentially faces, not the substance of his claim. The defendants have identified no basis for concluding that a scheme of ex post facto punishment is permissible merely because the individual at issue is simultaneously being subjected to a somewhat similar, but non-ex post facto, punishment such as parole. Moreover, as Doe has carefully documented, his registry status mandates extensive requirements and limitations that, though abstractly parole-like in nature, are far in excess of the requirements associated with actual parole in Tennessee.

Ultimately, if anything, the fact that Doe's registry conditions sometimes so closely resemble a super-charged version of parole bolsters his Ex Post Facto Clause claim. Doe is subject to his parole conditions because his parole is part of his *prospectively authorized criminal punishment*, as the Constitution permits. If the State of Tennessee had tried to impose such a sentence ex post facto, it would have been illegal. Putting Doe on an even more demanding version of parole retroactively, but calling it a registry status, is no more permissible. The facts that Doe has presented are enough to establish a strong likelihood of success, because they are enough to strongly suggest that the analysis that governed *Snyder* would prevail here. Doe, accordingly, has established that the first preliminary injunction factor strongly supports granting him the relief he requests.

## C. Application of Preliminary Injunction Factors

Having determined that Doe has a high likelihood of success on the merits with regard to his claims against the defendants, the court must turn to the remaining factors governing the consideration of a request for a preliminary injunction.

### 1. Irreparable Harm to the Plaintiff

The Sixth Circuit has held that, "if it is found that a constitutional right is being threatened or impaired, a finding of irreparable injury is mandated." *Bonnell v. Lorenzo*, 241 F.3d 800, 809 (6th Cir. 2001). At the very least, "irreparable injury is presumed." *Am. Civil Liberties Union Fund of Mich. v. Livingston Cty.*, 796 F.3d 636, 649 (6th Cir. 2015) (quoting *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012)). Doe's establishing a likelihood of success on the merits is, therefore, also enough to establish that this factor weighs in favor of granting his motion.

The irreparable harm that Doe faces, moreover, does not end with the abstract question of whether his constitutional rights are being honored. While Doe complains of many features of the Act, he has made clear that the restrictions that are most distressing to him are those that interfere with his ability to be an active father. Doe's children will not stop aging and growing while this case works its way through litigation. Every school activity or event that he is unable to share with them is one he will never get back.

These harms are, at most, only slightly mitigated by the fact that Doe would be harmed to some degree by his parole status regardless. The defendants have not identified any legal or factual basis for concluding that Doe, if placed solely on parole, would face restrictions that come anywhere near the level of restrictiveness of the requirements he faces under the Act, particularly with regard to parenting. This factor therefore strongly supports issuance of the preliminary injunction.

<u>2. Harm to the Public Interest and Third Parties</u>

The third and fourth factors of the preliminary injunction analysis—harm to others and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). With regard to these factors, the defendants rely on the state's interest in enforcing the Act and protecting the safety of the public. There is no evidence before the court, however, that Doe currently poses a threat to anyone—or that any such threat would be mitigated by requiring him to continue as a registered violent sexual offender. The only evidence before the court suggests that Doe is simply a man who committed serious crimes over three decades ago and who has spent his life, after leaving prison, as an ordinary member of society. The court cannot simply assume that the registry is serving any role in protecting the public in his case.

There is, moreover, no evidence that granting Doe's request would place an administrative burden on the defendants. By its own terms, the registry is designed to have individuals added and removed from its rolls with regularity, so there is no reason to think that removing Doe would be difficult, or that it would be difficult to re-add him at a later date if necessary. Indeed, any costs to the defendants appear to be so minimal that the court concludes that no cash surety would be necessary "to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c).

Finally, it is well-established that "the public interest is served by preventing the violation of constitutional rights." *Chabad of S. Ohio & Congregation Lubavitch v. City of Cincinnati*, 363 F.3d 427, 436 (6th Cir. 2004). Granting Doe the relief he seeks would not merely be benefiting him, but honoring a core constitutional commitment, recognized since the nation's earliest days.

The court stresses that nothing it writes here should be read to suggest that sexual offender registries themselves necessarily violate the Ex Post Facto Clause when applied

retroactively. Supreme Court precedent is clear that they do not. A state, however, is not free to use its registry as a back door to heap an endless parade of new and severe punishments on individuals whose long-ago offenses carried no such consequences when committed. Recognizing that a registry is not a license to violate the Ex Post Facto Clause would be a vindication of an essential constitutional commitment and, therefore, would advance the public's interest in constitutional governance bound by law. This factor, therefore, also supports granting the preliminary injunction.

### 3. Balancing the Preliminary Injunction Factors

All of the factors relevant to the court's consideration of Doe's request line up in favor of granting him the narrow relief he seeks. Doe has not sought to disrupt or obstruct the functioning of Tennessee's system of sexual offender registration in any general way. He simply asks that he, personally, be removed from that system on the ground that he was unconstitutionally brought into it. Because Doe has demonstrated his likelihood of success on the merits, shown the irreparable harm that registration is doing to him now, and established that the public interest would be served by his removal, he is entitled to a preliminary injunction.

## D. Motion to Dismiss Counts II through V

Doe has not argued that he can establish that he is entitled to a preliminary injunction based on his likelihood of success with regard to any of his claims other than Count I. The defendants, however, have sought the dismissal of all of his claims, including Counts II through V, which allege that more discrete aspects of the Act violate particular constitutional protections, regardless of whether they were applied prospectively or retrospectively. The court, accordingly, will consider those claims, but will limit its analysis to the sufficiency of Doe's allegations for the purposes of Rule 12(b)(6), not whether he has established a likelihood of success.

31

1. Count II

Count II is based on the defendants' alleged interference in Doe's "right to engage and participate in the ordinary occupations of life." (Doc. No. 1 ¶ 105.) In response to the Motion to Dismiss, however, Doe, who has worked steadily while subject to the Act, states that he does not object to the dismissal of this count. The court, therefore, will dismiss Count II without engaging in an unnecessary inquiry into the substance of the claim.

2. Count III

In his Complaint, Doe alleges that the Act violates his First Amendment rights in three ways: first, the requirement that he disclose various information about his internet activity burdens his access to the internet in a way that is not narrowly tailored to a compelling government interest; second, those same restrictions effectively eliminate his ability to engage in anonymous speech, which courts have recognized as a particular burden on expression; and, third, the Act "prevents [him] from participating in associations due to restrictions and the associated stigma from being branded as a registered sex offender." (*Id.* ¶ 113.) The defendants argue that none of these complaints renders the Act unconstitutional, either on its face or as applied to Doe.

There is little doubt that the Act, as written, places some burdens on Doe's speech. There is, for one thing, simply the administrative burden of keeping track of, and timely reporting, every account he uses on any website capable of communication. Additionally, his concerns about his inability to maintain his anonymity, particularly from law enforcement, are also, as pleaded, plausible. "[A]n author's decision to remain anonymous, like other decisions concerning omissions or additions to the content of a publication, is an aspect of the freedom of speech protected by the First Amendment." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 342

(1995). As a practical matter, there are countless constitutionally protected messages that a person might rationally wish to convey while retaining his anonymity, especially from law enforcement. For example, it is clear that Doe considers his inclusion on the registry to be an extraordinarily taxing, humiliating, and unnecessary burden on his life, and the substantial amount of litigation on this issue shows that he is not alone. But Doe, like other registrants, is also continually at the mercy of the very officials that his complaints criticize, who possess discretion with regard to how aggressively they will monitor his compliance with the Act and his parole. Doe's inability to, among other things, speak out against the Act without potentially drawing the ire of law enforcement raises legitimate constitutional concerns.

That said, the restrictions on Doe's online speech create hurdles and burdens but do not outright prevent him from conveying any protected message, other than by making that message anonymous to the state. "[G]overnment action that merely regulates the time, place, and manner of protected speech, that is, 'regulations that are unrelated to the content of speech[,] are subject to an intermediate level of scrutiny.'" *Planet Aid v. City of St. Johns, Mich.*, 782 F.3d 318, 326 (6th Cir. 2015) (quoting *Turner Broad. Sys., Inc. v. F.C.C.*, 512 U.S. 622, 642 (1994)). "Under this test, the government may impose reasonable content-neutral restrictions on the time, place, or manner of protected speech, provided the restrictions: (1) 'serve a significant governmental interest;' (2) are 'narrowly tailored;' and (3) 'leave open ample alternative channels for communication of the information.'" *Phelps-Roper v. Strickland*, 539 F.3d 356, 362 (6th Cir. 2008) (quoting *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989)). In light of the highly factual nature of those inquiries, several district courts have declined to dismiss claims such as Doe's on the ground that they were, at least, plausible and should be evaluated with the benefit of a factual record. *See Jackson*, 2020 WL 7496528, at *8; *Doe v. Gwyn*, 2018 WL 1957788, at

\*10; *Haslam*, 2017 WL 5187117, at \*18. This court agrees and will not dismiss his claims based on freedom of speech at this juncture.

The defendants argue that, even if the court permits Count III to proceed with regard to the alleged violations of Doe's speech rights, the court should dismiss Doe's claims insofar as they are based on alleged violations of his right to freedom of association. Unlike Doe's speech-based claims, his association-based claims are focused, in particular, on the "associated stigma from being branded as a registered sex offender," which, Doe claims, "prevents [him] from participating in associations." (Doc. No. 1 ¶ 113.) For example, Doe states that he "joined a fitness facility affiliated with a church in Hendersonville, Tennessee, until someone there told him he was not welcome due to his status on the sex offender registry." (*Id.* ¶ 72.) He also claims that he "was an avid member of a local church, until . . . [c]hurch leadership required [him] to submit to numerous conditions and restrictions to participate in church functions, which communicated to [him] that he was not welcome there." (*Id.* ¶ 73.) The defendants argue that Doe has not identified any caselaw stating that a stigmatic injury of the type Doe alleges is a ground for finding a violation of his constitutional right to association.

The term "association" does not appear in the text of the First Amendment itself, but the Amendment has long been recognized to reach, by extension from the rights specifically enumerated, "the right to associate for the purpose of speaking." *Hartwell v. Houghton Lake Cmty. Sch.*, 755 F. App'x 474, 477 (6th Cir. 2018) (quoting *Rumsfeld v. Forum for Acad. & Inst'l Rights, Inc.*, 547 U.S. 47, 68 (2006)). In addition to that First Amendment right of expressive association, the Supreme Court has recognized that "freedom of association" is an appropriate paradigm for construing the constitutional protection afforded to "choices to enter into and maintain certain intimate human relationships." *Roberts v. U.S. Jaycees*, 468 U.S. 609,

34

617 (1984); *see also Anderson v. City of LaVergne*, 371 F.3d 879, 882 (6th Cir. 2004) (observing that "courts have recognized both personal friendships and non-marital romantic relationships as the types of 'highly personal relationships' within the ambit of intimate associations contemplated by" the constitutional right of freedom to associate) (citing *Akers v. McGinnis*, 352 F.3d 1030, 1039 (6th Cir. 2003)). The parties therefore agree that, under current caselaw, Doe possesses certain rights to free association that the State of Tennessee cannot impinge upon without surviving heightened scrutiny.

Nevertheless, the defendants are correct that there is no caselaw suggesting that accurately including an individual on a sexual offender registry, based on a valid conviction that meets the requirements of that registry, raises a meaningful freedom of association issue simply because forging relationships is made more difficult based on the associated stigma. The criminal justice system, by its very operation, routinely stigmatizes individuals in ways that may make it harder for them to find communities in which they can participate. Indeed, even if Doe had never been made subject to the Act, he would likely face social stigma based on his rape convictions and his lengthy period of incarceration. Although such stigmas may be difficult to live with, they have not been held to pose constitutional problems.

There is simply no ground for concluding, under current caselaw, that an accurate government record that reflects poorly on a person, in and of itself, gives rise to a plausible association-based claim. Such a government record may, as a practical matter, affect an individual's relationships. Virtually any government action, however, has the capacity to negatively impact someone's important interpersonal relationships. If that was all that it took to raise a constitutional question, then the potential litigation would be endless. This court,

35

therefore, is not inclined to stray beyond the existing caselaw to hold that the right of freedom to associate can be implicated as indirectly as it has been implicated here.

That does not mean that Doe's stigmatic injuries are without constitutional dimension or that his association rights are not threatened by the Act. To the contrary, the Sixth Circuit's caselaw makes clear that the Act's stigmatizing of registrants is one of the issues accounted for in the Ex Post Facto Clause analysis. Moreover, the freedom to associate, as the court has explained, is closely tied to the right of freedom of speech, which the Act unambiguously does implicate. There may be aspects of Doe's claims about restrictions on his online behavior, for example, that implicate his freedom of association, because he might wish to use websites, not only to speak, but also to associate with others. Nothing about the court's rejection of Doe's discrete, stigma-based freedom of association claims should suggest that his right of free association is irrelevant to the claims that the court is not dismissing. That said, the defendants have correctly pointed out that some of the claims alleged in Count III do not state plausible grounds for relief, and the court will, accordingly, dismiss that count in part.

### 3. Count IV

Count IV is based on the Act's "interfere[nce] with [Doe's] ability and right to travel." (Doc. No. 1 ¶ 118.) In particular, Doe alleges that, although "[a]nyone on parole supervision in Tennessee is required to obtain a travel permit to travel out-of-state," Tennessee requires that "[p]arolees who are on the sex offender registry must also obtain a signature on the travel permit from the state they are visiting." (*Id.* ¶ 76.) According to the Complaint, Doe has found this requirement almost impossible to comply with. He "traveled once to New York, and once to Florida. When [he] arrived at the police stations in each location to obtain the required signature, no one with either police department would sign his permit." (Id. ¶ 77.)

36

As the defendants concede, "the Supreme Court has recognized a protected right to interstate travel" inherent in the Constitution. *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 534 (6th Cir. 2007) (citing *Saenz v. Roe*, 526 U.S. 489, 500 (1999)). "A state law implicates the right to travel when it actually deters travel, when impeding travel is its primary objective, or when it uses a classification that serves to penalize the exercise of the right." *Id.* at 535 (citing *Attorney Gen. of N.Y. v. Soto–Lopez*, 476 U.S. 898, 903 (1986)). While "not every policy that possibly burdens the right to travel triggers strict scrutiny," *Pencak v. Concealed Weapon Licensing Bd. for Cty. of St. Clair*, 872 F. Supp. 410, 414 (E.D. Mich. 1994), "[s]trict scrutiny is required" if the court concludes that the constitutional right to interstate travel has actually been "impinge[d]." *Mem'l Hosp. v. Maricopa Cty.*, 415 U.S. 250, 262 n.21 (1974).

To determine whether impingement has occurred, "[t]he court must consider whether the policy at issue deter[s] migration or serves to penalize the right to travel." *Pencak*, 872 F. Supp. At 414 (citing *Mem'l Hosp.*, 415 U.S. at 257). Strict scrutiny will not apply if the burden on the right ro travel is merely "incidental and negligible." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 535 (6th Cir. 2007) (citing *Town of Southold v. Town of East* Hampton, 477 F.3d 38, 54 (2d Cir. 2007)). If, however, strict scrutiny does apply, then the law can only be held to be constitutional if it is "narrowly tailored to a compelling governmental interest." *Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007) (quoting *Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000)).

An express restriction on interstate travel unless certain conditions are met plainly implicates the constitutional right of travel because it raises the possibility of an individual's being punished solely for traveling from one state to another. That does not, of course, mean that all such restrictions are invalid. The court notes that restrictions on interstate travel are common

for individuals on parole, and, indeed, Doe does not challenge Tennessee's general policy of requiring travel permits of parolees. Doe argues, rather, that the increased requirements he faces as a parolee on the sexual offender registry go beyond what strict scrutiny would permit.

For the purposes of Rule 12(b)(6), the court must accept, as true, Doe's assertions that (1) he would not face the destination-state signature requirement if he were not on the registry and (2) complying with that requirement has been and is likely to continue to be prohibitively difficult. In that light, Doe has pleaded Count IV with sufficient plausibility to proceed past the motion to dismiss stage. A factual record might reveal that his registry status does not, in fact, result in a restriction of his right to travel in significant excess of that imposed on other parolees. The record might also reveal that the signature requirement that Doe challenges is not as difficult to satisfy as he believes. For now, however, he has adequately alleged that, because he is on the registry, he is required to comply with an additional requirement that, in practice, amounts to a substantial, if not prohibitive, restriction on his ability to cross state lines. The court, accordingly, will not dismiss Count IV based on the face of the Complaint.

### 4. Count V

Count V is based on the Act's interference with Doe's "right to direct the education and upbringing of [his] children." (Doc. No. 1 ¶ 123.) The Supreme Court has repeatedly recognized that "fundamental rights and liberty interests" entitled to a heightened level of constitutional protection include, not only "the specific freedoms protected by the Bill of Rights," but also, among other things, the rights to marry, have children, and direct the education and upbringing of those children. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (listing cases). Doe argues that the Act has interfered in his parental rights through its restrictions on his ability to

attend and engage in school functions, as well as the travel restrictions that allegedly have prevented him from participating fully in the life of his out-of-state daughter.

As with Doe's claim based on his constitutional right to interstate travel, the viability of this claim is likely to hinge, in significant part, on factual questions regarding how severely the Act's requirements interfere in Doe's life and how much of that interference can be attributed to his registry status rather than his unchallenged status as a parolee. There is a point at which a sexual offender registration statute's indiscriminate interference in parenting activities of offenders who have not been shown to pose a risk to children will fail constitutional scrutiny, even if the law is ostensibly premised on the undeniably compelling state interest of protecting child welfare. *See Doe v. Snyder*, 101 F. Supp. 3d 672, 699 (E.D. Mich. 2015). Whether such a violation has occurred in Doe's case, however, depends both on the details of the Act's application to Doe as well as the question of what alternative legislative options the State of Tennessee might have had to address the issue of child safety in a less restrictive manner. Because Doe has alleged a claim that is at least plausible, the court will not dismiss Count V.

## V. CONCLUSION

For the foregoing reasons, Doe's Motion for Preliminary Injunction (Doc. No. 15) will be granted, and the defendants' Motion to Dismiss (Doc. No. 24) will be granted in part and denied in part. Count II will be dismissed in its entirety, and Count III will be dismissed in part.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

39