# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

JOHN DOE,                                    )
                                             )
Plaintiff,                                   )
                                             )
v.                                           )          Case No. 3:21-cv-00028
                                             )          Judge Aleta A. Trauger
WILLIAM LEE, in his capacity as              )
Governor of the State of Tennessee;          )
DAVID RAUSCH, in his capacity as             )
Director of the Tennessee Bureau of          )
Investigation; and LISA HELTON,              )
in her capacity as Commissioner of the       )
Tennessee Department of Correction,          )
                                             )
Defendants.                                  )

## MEMORANDUM

John Doe has filed a Motion for Summary Judgment (Doc. No. 58), to which Governor

William Lee ("Governor"), Tennessee Bureau of Investigation ("TBI") Director David Rausch

("Director"), and Tennessee Department of Correction ("TDOC") Commissioner Lisa Helton[1]

("Commissioner") have filed a Response (Doc. No. 66), and Doe has filed a Reply (Doc. No.

68). The Governor, Director, and Commissioner have filed a Motion for Summary Judgment

(Doc. No. 70), to which Doe has filed a Response (Doc. No. 76). For the reasons set out herein,

each motion will be granted in part and denied in part.

---

[1] The individual holding the office of TDOC Commissioner has changed since this litigation began.
Because Doe's claims are directed at the Commissioner in his or her official capacity, the current
Commissioner has been "automatically substituted as a party" pursuant to Fed. R. Civ. P. 25(d). The court
will use "Commissioner" to refer to whichever official held that position at the relevant time.

# I. BACKGROUND

## A. The Tennessee Sexual Offender Registry

### 1. Background

Prior to 1994, individuals in Tennessee convicted of sexual offenses faced formal consequences that were mostly similar to those borne by individuals convicted of similarly serious non-sexual offenses. In 1994, however, the Tennessee General Assembly, concerned with the potential actions of sexual offenders after they had served their sentences, adopted legislation requiring the TBI to "establish, maintain, and update a centralized record system of sexual offender registration and verification information." 1994 Tenn. Pub. Laws, ch. 976 § 7(a). Although different provisions have governed the treatment of registrants over the years, the court will, for convenience, refer to each of the successive laws on that topic as "the Act."

The Act, in its original form, required registration for all individuals convicted of any one of a number of identified sexual offenses, "unless the offender had been wholly released without supervision from incarceration, probation, or parole prior to January 1, 1995." *Doe v. Haslam*, No. 3:16-CV-02862, 2017 WL 5187117, at *1 (M.D. Tenn. Nov. 9, 2017) (Crenshaw, C.J.) (citing 1994 Tenn. Pub. Laws, ch. 976 § 3(2)–(3)). Accordingly, there existed a subset of defendants who were required to register based on crimes they committed before the registry was in place, namely: (1) convicted defendants who were still in the process of incarceration, parole, or supervision for a crime committed prior to 1995; and (2) individuals who had been or would be charged with committing crimes prior to 1995 but who had not yet been convicted. It is undisputed that the Act "does not provide for individualized assessment or consideration." (Doc. No. 63 ¶ 34.) Rather, an individual simply qualifies for the registry based on the existence of his conviction of a qualifying offense.

2

It is undisputed in this case that the sexual offender registry, in its original form, "was a confidential and private law enforcement database which acted as a centralized record system of sexual offender registration and verification information." (*Id.* ¶ 27.) The "original requirements" for being on the registry were, the parties agree, "limited":

> Persons required to register did so by completing and mailing monitoring forms to the TBI that requested basic information about the registrant including: name, date and place of birth, social security number, driver's license number, parole or probation officer's contact information, offenses of conviction, current place of employment, current address, and any other information deemed relevant. [The Act] did not require any in-person reporting or fee payments.

(*Id.* ¶ 28.) Any individual on the registry under this original regime could petition a court to be removed ten years after unsupervised release from probation, parole, or incarceration. (*Id.* ¶ 30.)

In the ensuing decades, however, the Tennessee General Assembly repeatedly returned to the sexual offender registration statutes to change whom they reached, what they required, and how much protection they offered to registered offenders' privacy. Chief Judge Crenshaw of this district has recounted the statutes' long history of more than two dozen revisions in *Doe v. Haslam*, No. 3:16-CV-02862, 2017 WL 5187117, at *1 (M.D. Tenn. Nov. 9, 2017). In short, Tennessee's sexual offender registration system progressed from a relatively simple system, dedicated to information gathering and tracking, into a far-reaching structure for regulating the conduct and lifestyles of registered sexual offenders—in many cases, for the rest of their lives. The court will briefly summarize some of the key provisions in their current form.

### 2. Division of Responsibilities, Initial Eligibility, and Levels of Offender

In addition to maintaining the registry database itself, TBI's responsibilities include operating the public-facing registry website, maintaining a supplemental law enforcement database with additional information unavailable to the public (such as internet usernames), adding and removing individuals from the registry, and providing certain registry-related training

3

to law enforcement. (Doc. No. 63 ¶ 118.) Most other ongoing activities related to the registry are overseen by the registrant's "[d]esignated law enforcement agency," which is defined as "any law enforcement agency that has jurisdiction over the primary or secondary residence, place of physical presence, place of employment, school or institution of higher education where the student is enrolled or, for offenders on supervised probation or parole, the department of correction or court ordered probation officer." Tenn. Code Ann. § 40-39-202(2). Accordingly, TDOC—which, as part of its ordinary duties, oversees Tennessee's supervision related to felony probation, parole, and community supervision for life—functions as a registering and supervising agency for those offenders that are both on the registry and on parole. (Doc. No. 63 ¶ 130.)

The current version of the Act—the Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification, and Tracking Act, or "TSOVSORVTA," sometimes shortened to "SORVTA"—like the versions before it, dictates that individuals convicted of certain enumerated offenses must register with law enforcement for inclusion on the registry database maintained by the TBI. Offenses that require registration are mostly ones that, on their face, contain a sexual element, such as serial indecent exposure, aggravated rape, and rape of a child.[2] Tenn. Code Ann. § 40-39-202(20)(A)(vii), (31)(A), (D).

The Act divides registrants into "sexual offenders" and "violent sexual offenders," based primarily on the particular offense of which the person was convicted.[3] The term "violent sexual offenders" encompasses not only "sexual offenders who use physical violence" but also "[r]epeat

---

[2] It is possible, however, to qualify for registration based on the kidnapping of a child other than one's own, without any additional sexual component. Tenn. Code Ann. § 40-39-202(20)(a)(vi).

[3] A separate category exists for "violent juvenile sexual offenders," Tenn. Code Ann. § 40-39-202(28), which is not relevant to this case.

sexual offenders" and "sexual offenders who prey on children." Tenn. Code Ann. §§ 40-39-201(b)(1), 40-39-202(20), (30)–(31). A (non-violent) sexual offender may petition to be removed from the registry after ten years, and his[4] petition will be considered in light of a number of factors, including his history of compliance with the Act's restrictions. Tenn. Code Ann. § 40-39-207(a). A violent sexual offender, however, will remain on the registry for the remainder of his life, regardless of his compliance or lack of additional offenses. Tenn. Code Ann. § 40-39-207(g)(2).

A registered offender's Tennessee-issued driver's license will identify him as a sexual offender or violent sexual offender, as applicable. Tenn. Code Ann. § 55-50-353. He is required to carry his driver's license or equivalent government-issued photo identification card whenever outside his home. Tenn. Code Ann. § 40-39-213.

### 3. Registration and Updating Information

An offender registering for the first time must provide the following information, on penalty of perjury:

(1) Complete name and all aliases, including, but not limited to, any names that the offender may have had or currently has by reason of marriage or otherwise, including pseudonyms and ethnic or tribal names;

(2) Date and place of birth;

(3) Social [S]ecurity number;

(4) A photocopy of a valid driver license, or if no valid driver license has been issued to the offender, a photocopy of any state or federal government issued identification card;

(5) For an offender on supervised release, the name, address and telephone number of the registrant's probation or parole officer or other person responsible for the registrant's supervision;

(6) Sexual offenses or violent sexual offenses for which the registrant has been convicted, the date of the offenses and the county and state of each conviction; or the violent juvenile sexual offense for which the registrant has been adjudicated

---

[4] Of course, women also may qualify as offenders under the statute.

5

delinquent, the date of the act for which the adjudication was made and the county and state of each adjudication;

(7) Name of any current employers and length of employment, including physical addresses and phone numbers;

(8) Current physical address and length of residence at that address, which shall include any primary or secondary residences . . . ;

(9) Mailing address, if different from physical address;

(10) Any vehicle, mobile home, trailer or manufactured home used or owned by an offender, including descriptions, vehicle information numbers and license tag numbers;

(11) Any vessel, live-aboard vessel or houseboat used by an offender, including the name of the vessel, description and all identifying numbers;

(12) Name and address of each institution of higher education in this state where the offender is employed or practices a vocation or is a student;

(13) Race and gender;

(14) Name, address and phone number of offender's closest living relative;

(15) Whether victims of the offender's convictions are minors or adults, the number of victims and the correct age of the victim or victims and of the offender at the time of the offense or offenses, if the ages are known;

(16) Verification by the TBI or the offender that the TBI has received the offender's DNA sample;

(17) A complete listing of the offender's electronic mail address information, including usernames, any social media accounts the offender uses or intends to use, instant message, other internet communication platforms or devices, and the offender's username, screen name, or other method by which the offender accesses these accounts or websites;

(18) Whether any minors reside in the primary or secondary residence;

(19)(A) Any other registration, verification and tracking information, including fingerprints and a current photograph of the offender, vehicles and vessels, as referred to in subdivisions (i)(10) and (i)(11), as may be required by rules promulgated by the TBI . . . ;

(20) Copies of all passports and immigration documents; and

(21) Professional licensing information that authorizes an offender to engage in an occupation or carry out a trade or business.

6

Tenn. Code Ann. § 40-39-203(*i*). The Act provides that much of this information, including the registrant's photograph, address and employer, "shall be considered public information" and must be made available to the public through a web page. Tenn. Code Ann. § 40-39-206(d).

The offender has an ongoing duty to keep this information up to date. "Within forty-eight (48) hours of establishing or changing a primary or secondary residence, establishing a physical presence at a particular location, becoming employed or practicing a vocation or becoming a student in this state, the offender shall register or report in person" with the appropriate law enforcement agency. Tenn. Code Ann. § 40-39-203(a)(1). A registrant also has 48 hours to report any "change in any other information given to the registering agency by the offender that is contained on the registration form" or any "material change in employment or vocation status." Tenn. Code Ann. § 40-39-203(a)(4), (6). The registrant has "three (3) days, excluding holidays" to report any change in his "electronic mail address information, any instant message, chat or other internet communication name." Tenn. Code Ann. § 40-39-203(7).

If the registrant fails to provide any of the required updated information within the time periods required, he has committed a Class E felony. Tenn. Code Ann. § 40-39-208(b). The registrant's first such offense is "punishable by a fine of not less than three hundred fifty dollars ($350) and imprisonment for not less than ninety (90) days." Tenn. Code Ann. § 40-39-208(c). The second violation "is punishable by a fine of not less than six hundred dollars ($600) and imprisonment for not less than one hundred eighty (180) days." Tenn. Code Ann. § 40-39-208(d). Any subsequent violations are "punishable by a fine of not less than one thousand one hundred dollars ($1,100) and imprisonment for not less than one (1) year." Tenn. Code Ann. § 40-39-208(e).

### 4. In-Person Reporting and Fees

The Act also requires periodic in-person reporting with the offender's designated law enforcement agency. Violent sexual offenders must "report in person during the months of March, June, September, and December of each calendar year, to the designated law enforcement agency, on a date established by such agency, to update the offender's fingerprints, palm prints and photograph, as determined necessary by the agency, and to verify the continued accuracy of the information in the TBI registration form." Tenn. Code Ann. § 40-39-204(b)(1). Other sexual offenders must report in person once per year. Tenn. Code Ann. § 40-39-204(c). At the sexual offender's check-in, or the violent sexual offender's first check-in, he is required to pay administrative fees not to exceed $150 to help cover the costs of his monitoring. Tenn. Code Ann. § 40-39-204(b)(1), (c).

5. Restrictions on Where a Registrant Can Live or Work

A registered offender may not

knowingly establish a primary or secondary residence or any other living accommodation or knowingly accept employment within one thousand feet (1,000') of the property line of any [1] public school, [2] private or parochial school, [3] licensed day care center, [4] other child care facility, [5] public park, [6] playground, [7] recreation center, or [8] public athletic field available for use by the general public.

Tenn. Code Ann. § 40-39-211(a)(1). There is an exception if the proximity exists solely because of the change in ownership of a property after the offender established the residence or began the job. Tenn. Code Ann. § 40-39-211(e). Violating this restriction is a Class E felony. Tenn. Code Ann. § 40-39-211(f). The first violation is "punishable by a fine of not less than three hundred fifty dollars ($350) and imprisonment for not less than ninety (90) days." Tenn. Code Ann. § 40-39-211(g)(1). The second violation "is punishable by a fine of not less than six hundred dollars ($600) and imprisonment for not less than one hundred eighty (180) days." Tenn. Code Ann. § 40-39-211(g)(2). Any subsequent violations are "punishable by a fine of not less than one

8

thousand one hundred dollars ($1,100) and imprisonment for not less than one (1) year." Tenn. Code Ann. § 40-39-211(g)(3).

<u>6. Restrictions on Registrant's Movements</u>

A registered offender is forbidden from knowingly

[b]e[ing] upon or remain[ing] on the premises of any building or grounds of any [1] public school, [2] private or parochial school, [3] licensed day care center, [4] other child care facility, [5] public park, [6] playground, [7] recreation center or public athletic field available for use by the general public in this state when the offender has reason to believe children under eighteen (18) years of age are present.

Tenn. Code Ann. § 40-39-211(d)(1). There are exceptions for certain expressly enumerated parenting-related activities, but those exceptions are only available if the offender has obtained "written permission or a request from the school's principal or the facility's administrator." Tenn. Code Ann. § 40-39-211(d)(2)(B). A separate provision allows a registered offender to pick up and drop off his child if he has provided the relevant administrator with written notice— meaning that, although the administrator can deny permission for most purposes, he cannot prevent the offender from transporting his child to and from the school or facility, as long as the offender leaves immediately and does not otherwise come onto the premises. Tenn. Code Ann. § 40-39-211(d)(2)(D).

An offender is also forbidden from "[s]tand[ing], sit[ting] idly, whether or not the offender is in a vehicle, or remain[ing] within one thousand feet (1,000') of the property line of any" of the aforementioned facilities "when children under eighteen (18) years of age are present, while not having a reason or relationship involving custody of or responsibility for a child or any other specific or legitimate reason for being there." Tenn. Code Ann. § 40-39-211(d)(1)(B).

9

A violation of either of these restrictions is a Class E felony. Tenn. Code Ann. § 40-39-211(f). The first violation is "punishable by a fine of not less than three hundred fifty dollars ($350) and imprisonment for not less than ninety (90) days." Tenn. Code Ann. § 40-39-211(g)(1). The second violation "is punishable by a fine of not less than six hundred dollars ($600) and imprisonment for not less than one hundred eighty (180) days." Tenn. Code Ann. § 40-39-211(g)(2). Any subsequent violations are "punishable by a fine of not less than one thousand one hundred dollars ($1,100) and imprisonment for not less than one (1) year." Tenn. Code Ann. § 40-39-211(g)(3). A violation that is "due solely to a lack of the written permission required," however, is punishable only by fine. Tenn. Code Ann. § 40-39-211(g)(4).

7. Additional Restrictions Related to Children

A registered offender may not "be alone with a minor or minors in a private area," defined generally as "any real or personal property, regardless of ownership, where the conduct of the offender is not readily observable by anyone but the minor or minors alone with the offender." Tenn. Code Ann. § 40-39-211(k)(1)(B), (2). Exceptions exist for the offender's own child, if certain criteria are met. Tenn. Code Ann. § 40-39-211(c), (k)(2). A violation is a Class E felony. Tenn. Code Ann. § 40-39-211(f). The first violation is "punishable by a fine of not less than three hundred fifty dollars ($350) and imprisonment for not less than ninety (90) days." Tenn. Code Ann. § 40-39-211(g)(1). The second violation "is punishable by a fine of not less than six hundred dollars ($600) and imprisonment for not less than one hundred eighty (180) days." Tenn. Code Ann. § 40-39-211(g)(2). Any subsequent violations are "punishable by a fine of not less than one thousand one hundred dollars ($1,100) and imprisonment for not less than one (1) year." Tenn. Code Ann. § 40-39-211(g)(3).

**B. Doe's Conviction, Prole, and Inclusion on the Registry**

In 1987, Doe pleaded guilty to several criminal charges, including two counts of aggravated rape. It is undisputed at this stage that Doe did not himself engage in sexual contact with either of the underlying adult victims. Rather, he pleaded guilty under a theory of accomplice liability. (Doc. No. 63 ¶¶ 1, 3.) Doe received a sentence of 65 years. He served 16 years of that sentence in prison and, in 2003, he was released on parole. The Parole Board directed Doe to complete sexual offender treatment, which he did. (*Id.* ¶ 6.) He is expected to remain on parole until 2044. (*Id.* ¶ 7.)

When Doe committed his crimes—and when he pleaded guilty—Tennessee had no sexual offender registry. Moreover, the defendants admit for the purposes of summary judgment that, "[a]side from one [general] study [on sexual offender recidivism] conducted in 2007, . . . TBI possesses no evidence that requiring Doe to comply with the Act protects the public." (*Id.* ¶ 122; *see* Doc. No. 58-6 ¶ 30.) Nevertheless, the Act classifies Doe as a violent sexual offender, and, as such, he is required to maintain his registration and comply with the many requirements of the Act for the rest of his life. (Doc. No. 63 ¶ 9.) He has, so far, never been charged with violating the Act. (Doc. No. 69 ¶ 8.) Doe, at the moment, is not on the registry, because he was removed pursuant to a preliminary injunction that he received as part of this litigation. (*See* Doc. No. 30.) If that preliminary relief is not superseded by a permanent injunction, however, his obligations and restrictions will resume.

For the past 15 years, Doe has worked in industrial maintenance. It is undisputed, for the purposes of summary judgment, that Doe "has been denied promotions, supervisory roles, and job opportunities at other businesses because of his status as a registered sex offender." (Doc. No. 63 ¶ 10.) After Doe was removed from the registry pursuant to the court's preliminary

injunction, he applied for a position at a company that had previously rejected him due to his status as a registered sexual offender. Now, with his name removed from the registry, he was offered a position. (*Id.* ¶ 11.)

Doe states that he has had difficulty finding housing due to the requirements of the Act and that, when he has found housing, he has been shunned by his neighbors due to his registry status. The defendants do not dispute that Doe's neighbors have reacted negatively to his status; the defendants do, however, take issue with Doe's characterization of his difficulties in finding housing. The defendants note that, since Doe became subject to the Act, he has lived "in Davidson County, then Williamson County, then Sumner County, then Williamson County, then Maury County, [and] then back [in] Davidson County."[5] (*Id.* ¶ 14; *see id.* ¶¶ 15, 17.)

While Doe was on the registry, he was, as the Act mandates, required to report in person every March, June, September, and December to update his registry information. (*Id.* ¶ 18.) At those visits, he was required to disclose a number of different types of information, including a "[c]omplete listing of his . . . . usernames [for] social media accounts" and online messaging services that he "uses or intends to use." (*Id.* ¶ 20.) Doe would also be freshly fingerprinted and photographed. (*Id.* ¶ 19.) He was required to pay an annual fee of $150. (*Id.* ¶ 47.)

When Doe was first required to register following his release from prison in 2003, his registry information was not available to the general public. A 2007 change to the Act, however, made the registry open to the public and searchable online. (Id. ¶ 21.) Any member of the public could therefore see Doe's name, address, photograph, other identifying information, and criminal history. (*Id.*) The Act required Doe to report in person within 48 hours any time he moved into a

---

[5] The defendants appear to be interpreting Doe's frequent changing homes as evidence *against* the premise that he has struggled to find appropriate housing. The court notes that it could just as easily suggest the opposite.

new residence, "establish[ed] a physical presence at a particular location," or started a new job. (*Id.* ¶ 22.) Doe's driver's license visibly designated him as a violent sexual offender. (*Id.* ¶ 52.)

For a period of time, TDOC did not permit Doe to use the internet at all, and, when he expressed a desire to open social media accounts, he was told by his parole officer that he could not. Doe maintains that this was due to his being on the registry, but the defendants respond that the past total restriction on Doe's internet activity was not based on registry status alone but was reserved for individuals, like Doe, who were both on the registry and on parole. (*Id.* ¶¶ 23, 93.) Similarly, registered offenders on parole were, for a period of time, wholly forbidden from using alcohol. (*Id.* ¶ 24.)

Doe is now free to use the internet, although not necessarily with the degree of privacy that ordinary users enjoy. The parties agree that, while Doe was on the registry, the defendants "could monitor all of his digital communications," which was made possible by the fact that TDOC required Doe to disclose not only all of his usernames on various websites but also his passwords. (*Id.* ¶¶ 92–93.) TDOC policies also require its agents to thoroughly search all internet-capable devices of registered offenders on parole. (*Id.* ¶ 95.) Nevertheless, Doe has ultimately been able to maintain a work email address, a home email address, and a LinkedIn account, to use YouTube, and to pay bills online. (Doc. No. 69 ¶ 17.) Doe concedes, for the purposes of summary judgment that, at least according to the evidence in the record, "TBI does not track the activity of registered sex offenders on the Internet," although he maintains that, in his case, it could have. (Doc. No. 77 ¶ 13.)

It is undisputed that, due to the Act's restrictions, a registered sexual offender, generally speaking, "cannot take [his] child to the park, go to [his] child's sports games, or attend [his] child's graduations." (Doc. No. 63 ¶ 102.) Those restrictions had an effect on Doe's ability to

parent. For example, he was unable to take his youngest daughter to the park until he was removed from the registry by this court's preliminary injunction. (*Id.* ¶¶ 104–05.) He was also unable to attend school functions without the permission of a principal, which he now can. (*Id.* ¶ 106.)

At one point, Doe took a vacation to New York and Florida. However, he was unable to find a police officer in either jurisdiction willing to sign his travel permission slip, as required by TDOC policies. (*Id.* ¶ 80.) Doe did not attempt to take a vacation again. Since Doe was removed from the registry in connection with this case, he has not been subject to TDOC's travel restrictions for parolees on the registry. He has, however, continued to be subject to the out-of-state travel restrictions that Tennessee imposes on ordinary parolees at his current level of supervision. (*Id.* ¶ 85.) Accordingly, Doe must still obtain a travel permit from TDOC, but he is not required to obtain a signature from law enforcement in the jurisdiction he has traveled to. (*Id.* ¶ 86.) Some non-registry parolees are subject to a similar signature requirement—specifically, those "with a history of violence or absconding, . . . who have a current order of protection against them, [who are] under a current sanction, [who are] on maximum supervision or higher, and [who have] a high risk assessment score"—but others are not. (*Id.* ¶ 91.) Doe's trips to New York and Florida did not result in his being assessed a parole violation. (Doc. No. 69 ¶¶ 5–6.)

Requests for travel permits by ordinary parolees are subject to different procedures than requests by otherwise comparable parolees on the registry; procedures for registrant parolees include a requirement for management-level approval. Doe maintains that one effect of these different procedures is that non-registry parolees are permitted to travel for longer. The defendants respond that, as long as permission is obtained, parolees on the registry may travel for as long as ordinary parolees. The defendants do not, however, dispute the existence of the

additional procedural restrictions that Doe identifies as the source for the more limited travel times. (Doc. No. 63 ¶¶ 89–90; Doc. No. 69 ¶ 3.)

**C. Relationship Between Doe's Registry Status and Parole**

As the court has noted, Doe, unlike many registered offenders, has spent most of the last several years both under the registry regime associated with the Act and on parole as part of his actual criminal sentence. Doe has found this dual status confusing at times, which the defendants do not dispute. (Doc. No 63 ¶ 57.) Doe's confusion is particularly understandable in light of the fact that some of the restrictions that TDOC has placed on his behavior were, as shown in the preceding section, imposed due to his registry status but were neither statutory requirements of the registry nor imposed pursuant to authority granted under the Act. Rather, they were "specialized conditions of parole" imposed *through* the parole system but only *on* parolees who were also registrants. (*Id.* ¶ 58.) Complicating matters further, a violation of a requirement of the Act would also have been treated as a violation of his parole and therefore could have resulted in Doe's being required to serve his full remaining sentence of incarceration. (*Id.* ¶ 62.)

TDOC recognizes the distinct issues associated with individuals in Doe's position and has a "Programmed Supervision Unit,"[6] also known as the "PSU," that oversees registered offenders who are on parole. TDOC also maintains a Handbook created for that purpose. Prior to this case, Doe was supervised by the PSU. (Doc. No. 63 ¶ 64; *see* Doc. No. 58-9.)

There are a number of features of the registry regime that overlap, in some ways, with features of parole—although those features may not, in their details, be equally stringent or invasive. For example, if Doe were simply an ordinary parolee, some information about him would be available through TDOC's Felony Offender Information website, but that information

---

[6] The parties sometimes refer to this unit as the "Program Supervision Unit," but its Handbook uses the word "Programmed." (*See* Doc. No. 58-9 at 6.)

15

would not include his home address, his place of employment, descriptions of his vehicles, his prior arrest history, or that he is or ever was designated a violent sexual offender. (Doc. No. 63 ¶ 60.) Similarly, an ordinary parolee must, upon request, show his parole officer non-public content on his social media account. (Doc. No. 69 ¶ 14.) Ordinary parolees, however, are not required to surrender all of their passwords—enabling unannounced monitoring at any time. (*Id.*)

As a matter of law, individuals on parole in Tennessee are "subject to" home visits and residence searches at any time. (Doc. No. 63 ¶ 71; Doc. No. 69 ¶ 20.) Doe argues, however, that this requirement is enforced far more onerously against parolees on the registry. TDOC's Sex Offender Standards for Supervision confirm that registered offenders under TDOC's supervision are subject to a certain number of minimum home visits and searches, depending on their TDOC "supervision level." Some offenders receive visits/searches once every three months, some once every six months, and some once per year. (Doc. No. 63 ¶ 72.) The defendants have not identified any comparable policy for non-registrant parolees. Doe also asserts that searches of ordinary parolees are less comprehensive with regard to common areas and areas controlled by roommates, although the defendants dispute that contention as insufficiently supported. (*Id.* ¶ 75.) The parties agree, however, that a registered offender on parole is forbidden by TDOC from living with anyone who would not consent to a search. If a roommate or other cohabiting person refuses such a search, the offender/parolee will be required to pack up and move immediately. (*Id.* ¶¶ 76–77.) Ordinary parolees are not subject to that rule (*Id.* ¶ 78.)

Finally, an ordinary parolee may seek suspension of his direct parole supervision, but a parolee who is also on the registry cannot. (*Id.* ¶¶ 69–70.)

**D. This Case**

On January 13, 2021, Doe sued the Governor, the Director, and the Commissioner regarding his continuing status as a registered violent sexual offender. (Doc. No. 1.) He pleaded five Counts, each pursuant to 42 U.S.C § 1983, for the deprivation of his constitutional rights: Count I is for violation of the Ex Post Facto Clause; Count II is for violation of his alleged constitutional right to work; Count III is for violation of the First Amendment arising out of the restrictions on his rights to communicate and associate with others; Count IV is for violation of his right to travel; and Count V is for violation of his constitutional rights as a parent. (*Id.* ¶¶ 101–27.) On January 20, 2021, Doe filed a Motion for Preliminary Injunction prohibiting any of the defendants from enforcing the Act against him. (Doc. No. 10 at 1.) He premised his request for preliminary relief solely on Count I, his Ex Post Facto Clause claim. (Doc. No. 12 at 1.) Meanwhile, the defendants filed a motion to dismiss. (Doc. No. 24.)

On May 12, 2021, the court dismissed Count II, dismissed Count III in part, and granted Doe's request for a preliminary injunction:

> It is hereby **ORDERED** that the defendants shall not enforce any provision of the Tennessee Sexual Offender and Violent Sexual Offender Registration, Verification, and Monitoring Act, Tenn. Code Ann. § 40-39-201 *et seq.*, against Doe or require Doe to comply with any portion of the Act. Each defendant shall, to the extent within his power, take such necessary steps to ensure that Doe is removed from Tennessee's sexual offender registry.

(Doc. No. 30 at 1.)

According to Doe, after the court granted him preliminary relief, TDOC did not give him "anything in writing from the parole office about how the conditions of [his] parole supervision had changed due to [his] removal from the registry." (Doc. No. 48 ¶ 2.) When he reported to the parole office for an assessment in December 2021, he tried to fill out "the reporting form for non-sex offenders" but was told by the parole officer that that was not the correct form for him.

(*Id.* ¶ 4.) A day or so later, however, a case manager called him and told him that he "no longer had an assigned parole officer" and "no longer needed to report in-person to the parole office." (*Id.* ¶ 5.) Again, however, he received no written explanation or assurances from TDOC about its position, which left him concerned. (*Id.*)

On January 21, 2022, several officers came to Doe's home unannounced to perform a "sex offender check." (*Id.* ¶ 6.) Shortly after the officers arrived, Doe complained to the officer who appeared to be in charge that he was no longer on the sexual offender registry. That officer called someone whom Doe believes was a supervisor, and, after the call was completed, the officer apologized to Doe and called on the other officers to stop their search and leave. According to Doe, the officer told him that his name had erroneously appeared on the officers' "list" of sexual offenders' homes to check, but the supervisor had informed the officer that that inclusion was in error. (*Id.* ¶ 7.) The officers left. (*Id.* ¶ 9.)

On February 23, 2022, Doe filed a Motion to Clarify, asking the court to (1) "find [that the Commissioner], through his agents and employees, violated the Court's preliminary injunction order" and (2) "clarify that its injunction prohibits TDOC from enforcing the registry laws against him, including the application of the Sex Offender Standards of Supervision against [him] and the supervision of [his] parole in the [Programmed Supervision Unit]." (Doc. No. 46 at 1–2.) The court granted the motion, but it stressed that its decision was based on the court's power to take supplemental steps necessary to enforce its own order, not any broader conclusion regarding the relationship between the registry and parole-related supervision or the court's power to review parole conditions as a general matter. (Doc. No. 56 at 5–6.) The court ordered the Commissioner to take steps to ensure that the Order would be enforced, including by removing Doe from the purview of the Programmed Supervision Unit. The court explained:

> While the court makes no findings regarding the general lawfulness of applying PSU supervision or any specific policy to an individual omitted from the sexual offender registry due to the Ex Post Facto Clause, the court finds that Doe has demonstrated the necessity of imposing additional guardrails in this case to prevent continued violations of the Commissioner's duties under the preliminary injunction.

(*Id.* at 8.)

On July 18, 2022, Doe filed a Motion for Summary Judgment. (Doc. No. 58.) The defendants filed their own Motion for Summary Judgment on September 7, 2022. (Doc. No. 70.) Those motions have been fully briefed and are ripe for decision.

## E. The Defendants' Additional Admissions Regarding the Act and the Registry

When the court previously considered Doe's claims, it did so only in the context of the pleadings and the relatively limited record assembled in connection with Doe's request for a preliminary injunction. Now, however, the parties have had the opportunity to engage in discovery, including investigation of both how the registry actually functions and what the defendants know—or do not know—about its efficacy.

The defendants now concede, for the purposes of summary judgment, the following facts regarding TBI's knowledge of the Act's effectiveness:

1. "Aside from one study [on sexual offender recidivism] conducted in 2007, which the TBI admitted does not analyze the efficacy of the sex offender registry, TBI possesses no studies or statistical evidence indicating that the registry reduces threats registrants pose to the public."

2. "TBI's belief that the Tennessee sex offender registry reduces recidivism is not based on anything besides anecdotal evidence";

3. "TBI has never examined whether crimes against children have decreased as a result of the sex offender registry being in place"; and

4. "TBI has not done any research into whether sex offenders whose victims were adults are more likely to commit crimes against children than other people."

(Doc. No. 63 ¶¶ 121–25.)

The defendants make similar concessions regarding TDOC's relative lack of knowledge of the Act's effects:

1. "TDOC and the Governor possess no studies or statistical evidence indicating that the registry reduces threats registrants pose to the public";

2. "TDOC does not conduct research on [the Act] and its effects in the community"; and

3. "TDOC is not aware if sex crimes have decreased since SORVTA was enacted."

(*Id.* ¶¶ 132–34.)

The defendants have further conceded that, although the Act imposes numerous restrictions related to offenders' proximity to children, a significant majority of registrants did not have minors as victims. Specifically, "[a]s of January 7, 2022, 18,642 out of the 25,911 sexual and violent sexual offenders on the TBI registry were not classified as offenders against children; thus, fewer than 30% of all offenders on the TBI registry were classified as offenders against children as of that same date." *(Id.* ¶ 128.) The defendants also concede, for the purposes of summary judgment, that "[r]esidence restrictions on registered sex offenders are not effective in reducing recidivism, and may increase the risk that sex offenders re-offend by undermining their stability." (*Id.* ¶ 136.)

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). To win summary judgment as to the claim of an adverse

20

party, a moving defendant must show that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim. Once the moving defendant makes its initial showing, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). Conversely, to win summary judgment as to its own claims, a moving plaintiff must demonstrate that no genuine issue of material fact exists as to all essential elements of her claims. "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. 242, at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## II. ANALYSIS

### A. Scope of Doe's Claims and Relationship to his Parole

As the issues related to enforcing Doe's preliminary injunction have demonstrated, the fact that Doe is on parole gives rise to some practical and conceptual obstacles regarding what this case can or should address. Doe's parole is part of his original criminal sentence, and it is well-settled that, at least as a general matter, a federal claim under § 1983 is not an appropriate

mechanism for challenging the validity of a sentence. *Holson v. Good*, 579 F. App'x 363, 365 (6th Cir. 2014) (citing *Heck v. Humphrey*, 512 U.S. 477, 487 (1994)). That does not mean that a prisoner serving a sentence is wholly without the protection of § 1983; he can still sue for injuries arising out of the "circumstances" in which his sentence is being carried out. *Muhammad v. Close*, 540 U.S. 749, 750 (2004) (citing *Preiser v. Rodriguez*, 411 U.S. 475, 500 (1973)). The ultimate validity of Doe's formal parole sentence, however, must be reviewed, if at all, through the ordinary process for appealing and/or collaterally challenging a sentence—not through § 1983's catch-all tort for the violation of federal rights that are not otherwise secured by statute. *But see Wilkinson v. Dotson*, 544 U.S. 74, 82 (2005) (holding that certain parole-related procedures can be challenged pursuant to § 1983, as long as the plaintiff does not challenge the sentence itself).

Doe has crafted his challenge to target the Act and the registry, not his parole. Admittedly, Doe's parole status has come up repeatedly; it is not really possible to tell a full, coherent story of Doe's dealings with the state in the years since his release without mentioning that aspect of events. The actual constitutional challenges that Doe has pleaded, however, focus on the registry—an ostensibly civil regime that is not, and has never been, part of the criminal sentence assessed against Doe in his original criminal proceedings. For example, Doe's claim regarding the right to travel—which, as the court will later discuss, is an area in which the distinction between parole and the registry becomes particularly salient—is stated as follows:

**COUNT IV: VIOLATION OF THE DUE PROCESS CLAUSE – TRAVEL**

116. Plaintiff realleges the foregoing paragraphs as though fully set forth herein.

117. Plaintiff's right to travel is a fundamental right protected under the Due Process Clause of the Fourteenth Amendment to the U.S. Constitution.

118. The SORVTA substantially interferes with Plaintiff's ability and right to travel.

119. Before restricting Plaintiff's right to travel, the SORVTA does not provide for any individualized assessment or consideration.

120. The SORVTA violates Plaintiff's fundamental right to travel because it is not narrowly tailored to serve a compelling government interest.

121. Defendants' enforcement of the SORVTA against Plaintiff violates Plaintiff's due process rights.

(Doc. No. 1 ¶¶ 116–21.)

In the abstract, the line between a permissible § 1983 challenge to the circumstances of a parole sentence and an impermissible § 1983 challenge to the sentence itself is not always easy to discern. *See Hurst v. Pribe*, No. 2:14-CV-2552, 2016 WL 1444241, at *3–4 (S.D. Ohio Apr. 13, 2016) (discussing approaches taken by different courts). For the purposes of this case, however, the fine details of that distinction are beside the point, because Doe, as the master of his Complaint, has chosen to challenge only the registry and the Act. The court's focus, therefore, must be on the registry, and the court must evaluate the registry as a distinct entity, just as Tennessee purportedly enacted it to be.

With that in mind, the court's analysis will be guided by two complementary principles. First, the court will not treat it as inherently constitutionally significant that Tennessee could do some of the things that it does to Doe through the registry—which was applied to him retroactively—through his parole, which was not. This court's role is to decide the cases and controversies that (1) are within its jurisdiction and (2) have been properly initiated through a complaint, indictment, or other procedurally appropriate mechanism. The pending causes of action in this case are § 1983 claims about the sexual offender registry, as it has actually existed and been applied to Doe. Doe's claims are not about what Tennessee could do, or even what it

has done, other than through the registry. All that matters, for the purposes of this case, is whether Tennessee acted within the confines of federal law—specifically, the Constitution—when it imposed the ostensibly civil restrictions that arise directly out of the registry and/or the Act.

Second, the court will proceed with the understanding that the scope of Doe's claims depends on the formal mechanism through which any given policy was imposed. Accordingly, if any policy that Doe has challenged turns out to exist solely as a parole condition—and not a feature of the registry regime itself—then the court will exclude that policy from its consideration. Just as an unlawful feature of the registry cannot be saved by the fact that it could have been a lawful parole condition, an unlawful parole condition cannot be swept into a challenge that is targeted exclusively at the registry. The court's analysis will accordingly focus on the registry and the Act, not the conditions of Doe's parole.

**B. Count I: Ex Post Facto Application of the Act**

1. Background

The court has already addressed the fundamental principles underlying this claim many times, but it will do so briefly again. The parties agree that the Constitution's state Ex Post Facto Clause, U.S. Const., art I, § 10, cl. 1, forbids the State of Tennessee from "retroactively . . . increas[ing] the punishment for criminal acts." *Collins v. Youngblood*, 497 U.S. 37, 43 (1990). It is well-settled that this prohibition covers more than express changes to the particular statutory sentence associated with an offense. *Peugh v. United States*, 569 U.S. 530, 539 (2013) (noting that the Supreme Court has "never accepted the proposition that a law must increase the maximum sentence for which a defendant is eligible in order to violate the Ex Post Facto Clause.") (citing *Lindsey v. Washington*, 301 U.S. 397 (1937)). To the contrary, a state's

24

"[s]ubtle ex post facto violation[]" is "no more permissible than [an] overt one[]." *Collins*, 497 U.S. at 46. Nevertheless, the Supreme Court has held that a state's retroactive application of a purely informational sexual offender registry does not, in and of itself, amount to an Ex Post Facto Clause violation, because such a database, without additional harms and restrictions, is not inherently a mechanism of punishment. *See Smith v. Doe*, 538 U.S. 84, 105–06 (2003).

The kind of mostly hands-off registry regime that the Supreme Court has previously reviewed, however, is, at least in Tennessee, a thing of the past. What the court must consider now is a scheme that, while technically centered around a registry, has the principal effect, not simply of sharing information, but of aggressively policing the actions of the individuals on that registry. To determine whether such a system amounts to a retroactive punishment, the court must apply a two-part test:

> [The court] must "ascertain whether the legislature meant the statute to establish 'civil' proceedings." If the intention of the legislature was to impose punishment, that ends the inquiry. If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, [the court] must further examine whether the statutory scheme is "so punitive either in purpose or effect as to negate [the State's] intention to deem it 'civil.'"

*Smith*, 538 U.S. at 92 (quoting *Kansas v. Hendricks*, 521 U.S. 346, 361 (1997)). If the registry at issue passes the first step of that inquiry—that is, if the enacting legislature had the foresight to formally identify it as civil, as Tennessee's did—then "'only the clearest proof' will suffice to override legislative intent and transform what has been denominated a civil remedy into a criminal penalty." *Id.* (quoting *Hudson v. United States*, 522 U.S. 93, 100 (1997)). The Supreme Court has identified certain factors, originally set forth in *Kennedy v. Mendoza-Martinez*, 372 U.S. 144 (1963), that are relevant to that inquiry: whether the challenged regulation "has been regarded in our history and traditions as a punishment; imposes an affirmative disability or

restraint; promotes the traditional aims of punishment; has a rational connection to a nonpunitive purpose; or is excessive with respect to this purpose." *Smith*, 538 U.S. at 97.

In *Doe v. Bredesen*, 507 F.3d 998 (6th Cir. 2007), the Sixth Circuit considered the application of the Ex Post Facto Clause to the version of the Tennessee registry regime in force at the time and concluded that the Act, in its then applicable form, was not punitive. The court noted, in particular, that "registration, reporting, and surveillance components are not of a type that we have traditionally considered as a punishment" and that the Act does not "prevent [a registered offender] from changing jobs or residences or traveling to the extent otherwise permitted by their conditions of parole or probation."[7] *Id.* at 1005.

In the ensuing years, however, the Tennessee General Assembly continued its pattern of expanding the requirements of the registration regime by amendment, particularly with regard to restrictions related to children, regardless of the age of the offender's victim. For example, restrictions about entering schools, playgrounds and other facilities were added in 2008. *See* 2008 Tenn. Pub. Acts, ch. 1164, § 11. Restrictions related to libraries were added in 2011. *See* 2011 Tenn. Pub. Acts, ch. 287. The Act's residence restrictions regarding schools and other facilities were extended to offenders whose victims were adults in 2014. *See* 2014 Tenn. Pub. Acts, ch. 992, § 1. The prohibition on being alone with children other than one's own in a "private area" were added in 2015. *See* 2015 Tenn. Pub. Acts, ch. 516.

---

[7] This language is somewhat confusing when taken in isolation. At the time, the Act did, in fact, restrict where a registered offender could live or work, which had been discussed at length at the district court level. The district court, consistently with the law, concluded that, "[w]hile provisions of the Act restrict sexual offenders from establishing a residence or employment within a certain radius of schools or child care facilities, offenders do not *need permission* to move or change jobs and are free to live and work *away from those restricted areas*." *Doe v. Bredesen*, No. 3:04-CV-566, 2006 WL 849849, at *8 n.5 (E.D. Tenn. Mar. 28, 2006) (emphasis added). The court construes the Sixth Circuit's opinion as making the same point rather than suggesting that changing jobs or residences was not impeded to any extent.

In 2016, the Sixth Circuit considered the issue of retroactive application of registration laws anew in *Does #1-5 v. Snyder*, 834 F.3d 696 (6th Cir. 2016). That case involved Michigan's sexual offender registration system, which, the court wrote, "began in 1994 as a non-public registry maintained solely for law enforcement use" but "ha[d] grown into a byzantine code governing in minute detail the lives of the state's sex offenders." *Id.* at 697. The court recounted a history of amendments strikingly similar, though not identical, to Tennessee's:

> Over the first decade or so of SORA's[8] existence, most of the changes centered on the role played by the registry itself. In 1999, for example, the legislature added the requirement that sex offenders register in person (either quarterly or annually, depending on the offense) and made the registry available online, providing the public with a list of all registered sex offenders' names, addresses, biometric data, and, since 2004, photographs. *See* Mich. Pub. Act. 85 §§ 5a(4), 8(2), 10(2)(3) (1999); Mich. Pub. Acts 237, 238 (2004). Michigan began taking a more aggressive tack in 2006, however, when it amended SORA to prohibit registrants (with a few exceptions, *see* Mich. Comp. Laws § 28.734–36) from living, working, or "loitering" within 1,000 feet of a school. *See* Mich. Pub. Acts 121, 127 (2005). In 2011, the legislature added the requirement that registrants be divided into three tiers, which ostensibly correlate to current dangerousness, but which are based, not on individual assessments, but solely on the crime of conviction. *See* Mich. Pub. Acts 17, 18 (2011). The 2011 amendments also require all registrants to appear in person "immediately" to update information such as new vehicles or "internet identifiers" (e.g., a new email account). *See id.* The 2006 and 2011 amendments apply retroactively to all who were required to register under SORA. *See* Mich. Pub. Act 46 (2006); Mich. Pub. Acts 17, 18 (2011). Violations carry heavy criminal penalties. See Mich. Comp. Laws § 28.729.

*Snyde*r, 834 F.3d at 697–98. Five plaintiffs challenged the law on various grounds, including the Ex Post Facto Clause. The case went to a bench trial, which permitted the development of a significant factual record. The Sixth Circuit, based on that record, noted that the plaintiffs "had trouble finding a home in which they c[ould] legally live or a job where they c[ould] legally work," and "those Plaintiffs who ha[d] children (or grandchildren)" were prevented "from

---

[8] "SORA" stands for "Sex Offender Registration Act," an acronym used for Michigan's Act and also used generically to refer to many states' acts, including often Tennessee's—even though that is not actually the present name for the Act.

watching them participate in school plays or on school sports teams" or from "visiting public playgrounds with their children for fear of 'loitering.'" *Id.* at 698.

The Sixth Circuit performed the first step of the *Smith* analysis and found that the statute purported to be civil and non-punitive on its face. *Id.* at 700–01. The court then focused the second part of the *Smith* analysis on the five *Mendoza-Martinez* factors that *Smith* had identified as particularly salient in registry cases:

> (1) Does the law inflict what has been regarded in our history and traditions as punishment?
>
> (2) Does it impose an affirmative disability or restraint?
>
> (3) Does it promote the traditional aims of punishment?
>
> (4) Does it have a rational connection to a non-punitive purpose?
>
> (5) Is it excessive with respect to this purpose?

*Id.* at 701 (citing *Smith*, 538 U.S. at 97.)

With regard to the first factor—history and tradition—the court noted that, although Michigan's act had "no direct ancestors in our history and traditions," it "resemble[d], in some respects at least, the ancient punishment of banishment" as well as "traditional shaming punishments." *Id.* at 701–02. The court cited evidence that vast swathes of the state's more populous areas were unavailable to the registrants for living or working and that the registrants were branded with derogatory classifications that did not reflect an individualized determination that doing so was justified. *Id.* The court also observed that life under the Michigan system, unlike life under the Alaska system upheld in *Smith*, "resembles the punishment of parole/probation." *Id.* at 703. The court explained:

> [R]egistrants are subject to numerous restrictions on where they can live and work and, much like parolees, they must report in person, rather than by phone or mail. Failure to comply can be punished by imprisonment, not unlike a revocation of

parole. And while the level of individual supervision is less than is typical of parole or probation, the basic mechanism and effects have a great deal in common. In fact, many of the plaintiffs have averred that SORA's requirements are more intrusive and more difficult to comply with than those they faced when on probation.

*Id.*

The court also found that the second factor—affirmative disability and restraint—favored a finding of punitive effect, in light of the aforementioned restrictions on a registered offender's residence, work, and movement. The court observed that those restrictions amounted to "restraints . . . greater than those imposed by the Alaska statute [at issue in *Smith*] by an order of magnitude." *Id.* With regard to factor three—the traditional aims of punishment—the court concluded that the Michigan act

> advances all the traditional aims of punishment: incapacitation, retribution, and specific and general deterrence. Its very goal is incapacitation insofar as it seeks to keep sex offenders away from opportunities to reoffend. It is retributive in that it looks back at the offense (and nothing else) in imposing its restrictions, and it marks registrants as ones who cannot be fully admitted into the community. Further, . . . it does so in ways that relate only tenuously to legitimate, non-punitive purposes. Finally, its professed purpose is to deter recidivism . . . , and it doubtless serves the purpose of general deterrence.

*Id.* at 704.

The last two factors—rational relationship to purpose and excessiveness—are closely related because they both consider the degree to which a law serves its stated civil purpose, as opposed to, for example, a desire for retribution or stigmatization appropriate only in the criminal context. The Sixth Circuit found that, based on the evidence in the record, the connection between the registration regime and its stated public safety purposes was weak. The court noted a study "suggest[ing] that sex offenders (a category that includes a great diversity of criminals, not just pedophiles) are actually *less* likely to recidivate than other sorts of criminals." *Snyder*, 834 F.3d at 704 (citing Lawrence A. Greenfield, Recidivism of Sex Offenders Released

29

from Prison in 1994 (2003)). "In fact," the court observed, "one statistical analysis in the record concluded that laws such as SORA actually *increase* the risk of recidivism, probably because they exacerbate risk factors for recidivism by making it hard for registrants to get and keep a job, find housing, and reintegrate into their communities." *Id.* at 704–05 (citing J.J. Prescott & Jonah E. Rockoff, *Do Sex offender Registration and Notification Laws Affect Criminal Behavior?,* 54 J.L. & Econ. 161, 161 (2011)). Likewise, with regard to excessiveness, the court observed that the Michigan law imposed a number of laborious requirements on offenders for which the actual public safety benefits were, at best, speculative, concluding that the "punitive effects of these blanket restrictions thus far exceed even a generous assessment of their salutary effects." *Id.* at 705.

The court accordingly found that the Michigan law was punitive in effect and could not be imposed retroactively. *Id.* (collecting similar holdings from other courts). The court forcefully explained:

> A regulatory regime that severely restricts where people can live, work, and "loiter," that categorizes them into tiers ostensibly corresponding to present dangerousness without any individualized assessment thereof, and that requires time-consuming and cumbersome in-person reporting, all supported by—at best—scant evidence that such restrictions serve the professed purpose of keeping Michigan communities safe, is something altogether different from and more troubling than Alaska's first-generation registry law. SORA brands registrants as moral lepers solely on the basis of a prior conviction. It consigns them to years, if not a lifetime, of existence on the margins, not only of society, but often, as the record in this case makes painfully evident, from their own families, with whom, due to school zone restrictions, they may not even live. It directly regulates where registrants may go in their daily lives and compels them to interrupt those lives with great frequency in order to appear in person before law enforcement to report even minor changes to their information.
>
> We conclude that Michigan's SORA imposes punishment.

*Id.* at 705.

2. Application of _Snyder_ to this Case

The court considered the application of _Snyder_ to the Act in its Memorandum of May 12, 2021, concluding that Doe had demonstrated a high likelihood of success in establishing that Tennessee's very similar scheme also qualifies as punitive for Ex Post Facto Clause purposes. (Doc. No. 29 at 25–28.) Now, following discovery and briefing, Doe's case is even stronger—particularly in light of the defendants' striking admissions regarding the lack of evidence that the Act serves its ostensible civil purposes. Indeed, when it comes to some of the Act's most demanding restrictions, the defendants' admissions go beyond simply conceding that there is a _lack of evidence_ that the Act is effective. The defendants have conceded, for the purposes of summary judgment, that "[r]esidence restrictions on registered sex offenders _are not effective_ in reducing recidivism, and may increase the risk that sex offenders re-offend by undermining their stability." (Doc. No. 63 ¶ 136 (emphasis added).) That is not an admission that the Act lacks empirical support; it is an admission that one of the centerpieces of the Act outright does not prevent further sexual violence or abuse and may even increase it.

Such admissions offer powerful support for Doe's already strong case, particularly with regard to the last two _Mendoza-Martinez_ factors—rational relationship to a legitimate civil purpose and proportionality to that purpose. There is simply no plausible argument that the lifetime imposition of the entire suite of restrictions included in the Act—at least some of which the defendants concede, for the purposes of summary judgment, do not actually prevent recidivism—is a proportionate civil response to a supposed risk of which there is no evidence other than the fact that a person was an accessory to two sex crimes committed by other perpetrators against adults thirty-five years ago.

31

The defendants have now had the opportunity to defend the Act numerous times, in numerous cases in this court, and they continue to come up almost entirely empty-handed when it comes to evidence either that (1) the Act is any less aggressively punitive than it appears to be or (2) the Act effectively serves any civil purpose that would outweigh those obviously punitive effects. The defendants make much of the fact that a plaintiff bears the initial burden of refuting the General Assembly's designation of the Act as civil, but Doe has offered plenty of support for his position that it is punitive—and, indeed, there is a great deal of support for that conclusion on the Act's face. The initial allocation of burdens is, moreover, not the get-out-of-presenting-a-case card that the defendants seem to hope that it is. True, Doe bore the initial burden of showing punitive purpose and effect. It is the government, though, that actually oversees the registry, knows its ostensible purpose, and can explain why, contrary to an abundance of similarities to criminal punishments, the registry supposedly is not one. It may not have been the governments' initial burden to provide that information, but once the evidence and argument had been marshalled in support of Doe's position, that burden framework provided no excuse for the defendants' failure to rebut Doe's case—if the defendants had anything with which to rebut it. Doe has therefore demonstrated that the tenuous relationship between the Act and its stated civil purpose overwhelmingly supports a finding that the Act is punitive.

In every other respect, as well, the *Snyder* analysis continues to apply with at least as much force as it did when the court considered the request for a preliminary injunction. Tennessee's registry is not exactly like banishment, parole, or every historical instance of shaming, but it is similar in the same ways that Michigan's law was. It restricts freedom of movement and participation in society in the same way.[9] The defendants make several arguments

---

[9] The defendants make much of the fact that the plaintiffs in *Snyder* prepared maps in support of their claims, while Doe has not. The court has addressed this argument, from the same defendants, before. *See*

32

on these issues—as they have many times now—but those arguments are, at least for the most part, really critiques of *Snyder*—not arguments capable of swaying this court, which has no authority to disregard the edicts of the Sixth Circuit.

In short, every important factor—other than the legislature's stated intent—strongly supports a holding that the Act is punitive. Indeed, if one steps back for a moment and simply looks at the Act for what it is, that conclusion is obvious. Very little about the registry regime that actually exists in Tennessee in 2022 resembles the non-punitive, public safety-minded civil mechanism that it purports to be. Why would such a system treat *all* sexual offenders like child predators, when many demonstrably are not? Why would it be crafted to create so many opportunities to catch individuals in minor, technical violations of unusually quick deadlines, rather than focusing on actual risks? Why would it have no mechanism for an individual in Doe's position to demonstrate that he is not worth the resources being devoted to him, so that those resources could be redirected to individuals who have displayed actual indicia of dangerousness sometime during this century? And, perhaps most strikingly of all, if the registry is such a vaunted and important tool for ensuring public safety, why do the officials in charge of it have so little apparent interest in assessing whether it actually works and, by extension, if it could work

_____

*Jordan v. Lee*, No. 3:19-CV-00907, 2022 WL 1196980, at *17 (M.D. Tenn. Apr. 21, 2022). Neither *Snyder*, nor the *Mendoza-Martinez* test generally, requires a plaintiff to establish the precise amount of territory in which a registrant's presence, movement, residency, or work is restricted. The pertinent question, rather, is whether the Act excludes registrants from so much of their communities that it is (1) comparable to banishment and (2) a sufficient restriction on physical liberty that it amounts to an affirmative disability or restraint. While an expert-created map would undoubtedly help with such an inquiry, it is not mandated, and the court's duty is to look at the evidence that *is* available in this case and determine what outcome the law requires. That evidence, moreover, can include judicial notice of general, indisputable geographic facts. *See Tucker v. Outwater*, 118 F.3d 930, 935 (2d Cir. 1997) ("[T]his court takes judicial notice of the fact that Jefferson County and Yates County do not adjoin and, in fact, are separated by over 100 miles and several large lakes."). The court therefore can base its decision on the obvious fact that, in Tennessee's denser cities, schools, parks, and daycares are geographically commonplace and difficult to avoid. *Cf. Doe #1 v. Lee*, 518 F. Supp. 3d 1157, 1188 (M.D. Tenn. 2021) (Richardson, J.) (finding that maps presented in support of similar claims "clearly" showed "that a large portion of Davidson County is unavailable to Plaintiffs and other registered sex offenders.").

better? Indeed, if one assumes that the registry is actually a meaningful tool for public safety, it makes the defendants' apparent indifference to its effectiveness especially baffling, if not outright distressing.

As a punishment, though, the Act makes much more sense. Placement on the registry means that an individual is aggressively stigmatized, has his physical freedom significantly restricted, must jump through numerous hoops to maintain his freedom, and is excluded from equal participation in many important aspects of life—all due solely to his conviction of a criminal offense, and with negligible support for the premise that any alternative civil purpose is being served. The word for such a policy is "punishment," and clearly so. Whatever proper role punishments serve in our legal system, it is a categorical constitutional rule that they cannot be imposed retroactively, which Doe's was. Doe is therefore entitled to summary judgment as to Count I.

## B. Count III: First Amendment

The court earlier dismissed some aspects of Count III, as originally pleaded, but it allowed others to proceed. Doe characterizes his remaining First Amendment claims as threefold:

> First, the Act imposed a significant administrative burden on Doe to keep track of and report his online conduct. Second, [the Governor and Director] admitted that prior to his removal from the registry, they could monitor all of his online communications. Third, Doe was told at some point that he could not have social media accounts or use the internet at all.

(Doc. No. 59 at 15 (citations omitted).) The third of those alleged violations is purely retrospective in nature, as Doe has not identified any basis for even suspecting that he will be subjected to a total internet ban in the future. Doe, however, has sought only declaratory and prospective relief in connection with Count III (Doc. No. 1 at 25)—which is all that he could

seek, given that he has sued the defendants in their official capacities, as contemplated by *Ex parte Young*, 209 U.S. 123 (1908). *See Diaz v. Mich. Dep't of Corr.*, 703 F.3d 956, 964 (6th Cir. 2013) ("In order to fall within the *Ex parte Young* exception, a claim must seek prospective relief to end a continuing violation of federal law.") (citation omitted). The court accordingly must focus on whether Doe's rights are violated by the lesser, but still significant, ongoing restrictions he would still be facing, were it not for this court's preliminary injunction.

The parties agree that the Act's internet-related restrictions are subject to what is typically referred to as "intermediate scrutiny." (Doc. No. 59 at 15–16; Doc. No. 66 at 15.) In order to survive that level of scrutiny, a law "must be 'narrowly tailored to serve a significant government interest[] and leave open ample alternative channels of communication.'" *Ramsek v. Beshear*, 989 F.3d 494, 498 (6th Cir. 2021) (quoting *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 45 (1983)). The government's proffered significant government interest is "protecting the public from sexual offenders," and, while Doe does not concede that his simply being a past offender establishes that he is someone from whom the public needs protection, he does not ultimately dispute that public safety is a sufficiently significant government interest to survive intermediate scrutiny, if all other requirements are met. (Doc. No. 66 at 15; *see* Doc. No. 59 at 16.) The only contested issues before the court are therefore whether the Act's restrictions are narrowly tailored to serve that interest, and whether they leave open ample alternative channels of communication.

One major challenge in considering these issues is that it may require a fairly significant factual record to understand the effect of any particular internet-related restriction at any given time. Both the internet itself and the way that people use it are constantly changing. Outright bans on accessing the internet at all may present a relatively straightforward case, but, for more

targeted or subtle restrictions, the extent of actual intrusion on free speech inherently depends on the nuts and bolts of what ordinary internet usage actually entails at any given moment. Without such evidence, the court can only rely on broad conjecture about the actual effects of a challenged restriction.

Because Doe is the plaintiff, and because the defendants have challenged the sufficiency of his case, it fell to Doe to ""make a showing sufficient to establish the existence of [the] essential element[s]' of [his] claim." *Pineda v. Hamilton Cnty., Ohio*, 977 F.3d 483, 491 (6th Cir. 2020) (quoting *Viet v. Le*, 951 F.3d 818, 823 (6th Cir. 2020)) He has failed to do so. First, he has not presented evidence that would permit the court to conclude that the restrictions and disclosure requirements infringed on his speech in any way other than the straightforward, but relatively limited, intrusions obvious from the face of the Act. Nor has Doe presented evidence— for example, from an expert in social or internet usage patterns—placing those restrictions in a context that would allow a reasonable finder of fact to extrapolate any particular downstream effects. Such expert testimony might be unnecessary if Doe himself could explain the significance of the restrictions imposed, but he has also failed to produce evidence that the Act's internet-related provisions are being used in any particularly problematic way against him or are preventing him from engaging in any particular type of speech that he wishes to pursue. At most, he has simply demonstrated that his own internet usage was hampered by some combination of the Act and his parole, but the most substantial of those effects appear to have been attributable to parole-based restrictions that Tennessee has since abandoned and that cannot be directly attributed to the Act.

All that is left, then, is that the State of Tennessee requires some individuals convicted of certain offenses—in this case, aggravated rape—to disclose information about their online

accounts, which officials stockpile and make available to law enforcement but otherwise, for the most part, do not affirmatively use. The only actual hardships associated with that policy that Doe has identified are (1) the no doubt irritating but ultimately minor burden of keeping track of the required information and (2) the risk of surveillance that, based on the evidence before the court, never actually happened. The court finds no sufficient basis for a finder of fact to conclude that those burdens were insufficiently narrowly tailored to the issue of public safety, particularly in light of the fact that, while the Supreme Court's caselaw does not resolve whether aggressive registry regimes such as Tennessee's are punitive or not, the Supreme Court has acknowledged the permissibility of relying on an individual's prior conviction of a sexual offense as the trigger for including that person in a public safety-focused informational resource. *See Smith*, 538 U.S. at 103. The court also finds that Doe has not identified sufficient facts to permit a finder of fact to conclude that the Act leaves him with insufficient avenues for communication. Indeed, the Act, at least on its face and as shown by the record, does not foreclose any particular avenue of electronic communication other than the ability to communicate through an account of which law enforcement is unaware.

Finally, there is no evidence in the record establishing that there is anything about Doe's particular need or desire to use the internet that would render the Act impermissibly restrictive with regard to him on an as-applied basis. To the contrary, at least as far as the record shows, Doe uses the internet in fairly straightforward ways that are unlikely to be hampered by the Act, and he does not have any kind of specific desire to engage in any other form of online communication that the Act would chill or frustrate. The court therefore can only judge the constitutionality of the Act—either in general or as applied to Doe—based on the restrictions apparent from the Act's express terms, in the context of the fairly limited facts about ordinary

internet usage of which the court can take judicial notice. At least in that context, there is no basis for holding the internet reporting provisions independently unconstitutional. *See Doe #1 v. Lee*, 518 F. Supp. 3d 1157, 1217 (M.D. Tenn. 2021) (holding that, although the internet reporting requirements are "confusing," the restrictions are not themselves unconstitutional on their face).

The court stresses that its reasoning should not be construed as a clean bill of constitutional health for the Act's internet-related provisions. As the court has noted before and notes again, those restrictions tread on genuinely dangerous constitutional terrain, and sexual offenders have First Amendment rights just as other Americans do. The court's duty here, however, is solely to determine who in this case, if anyone, is entitled to summary judgment on the specific claims pending. Based on the record presented and the allocation of burdens under Rule 56, the court concludes that the defendants are so entitled. It may well be that another plaintiff—particularly one with (1) a more significant actual need or desire to use the internet in some way hampered by the Act and/or (2) detailed evidence regarding the practical effects of the internet restrictions on ordinary internet use—could nevertheless succeed on a similar claim. Doe, however, has failed to demonstrate that he can, and the court will therefore grant the defendants summary judgment as to Count III.

## C. Count IV: Right to Travel

Count IV is based on the Act's "interfere[nce] with [Doe's] ability and right to travel." (Doc. No. 1 ¶ 118.) "[T]he Supreme Court has recognized a protected right to interstate travel" inherent in the Constitution. *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 534 (6th Cir. 2007) (citing *Saenz v. Roe*, 526 U.S. 489, 500 (1999)). "A state law implicates the right to travel when it actually deters travel, when impeding travel is its primary objective, or when it uses a classification that serves to penalize the exercise of the right." *Id.* at 535 (citing *Attorney*

*Gen. of N.Y. v. Soto–Lopez*, 476 U.S. 898, 903 (1986)). While "not every policy that possibly burdens the right to travel triggers strict scrutiny," *Pencak v. Concealed Weapon Licensing Bd. for Cty. of St. Clair*, 872 F. Supp. 410, 414 (E.D. Mich. 1994), "[s]trict scrutiny is required" if the court concludes that the constitutional right to interstate travel has actually been "impinge[d]." *Mem'l Hosp. v. Maricopa Cnty.*, 415 U.S. 250, 262 n.21 (1974).

To determine whether impingement has occurred, "[t]he court must consider whether the policy at issue deter[s] migration or serves to penalize the right to travel." *Pencak*, 872 F. Supp. at 414 (citing *Mem'l Hosp.*, 415 U.S. at 257). Strict scrutiny will not apply if the burden on the right to travel is merely "incidental and negligible." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 535 (6th Cir. 2007) (citing *Town of Southold v. Town of East* Hampton, 477 F.3d 38, 54 (2d Cir. 2007)). If, however, strict scrutiny does apply, then the law can only be held to be constitutional if it is "narrowly tailored to a compelling governmental interest." *Does v. Munoz*, 507 F.3d 961, 964 (6th Cir. 2007) (quoting *Seal v. Morgan*, 229 F.3d 567, 574 (6th Cir. 2000)).

Doe has identified features of his treatment as a parolee on the registry that plainly implicate those constitutional principles. In particular, TDOC's policy of requiring Doe and other similarly situated individuals to obtain approval from law enforcement in any state he visits— without actually ensuring that there is a practicable mechanism for seeking and receiving fair, prompt consideration of his request—may come close to being the practical equivalent of an outright ban on travel to at least some states, which would undoubtedly raise at least the specter of strict scrutiny.

Here, however, the distinction between Doe's parole conditions and his registry conditions comes to the fore. As the defendants point out, federal caselaw has typically permitted

fairly robust restrictions on travel in connection with parole, based on the premise that a parolee is, as a formal matter, still technically in state custody as part of his sentence. *See Jones v. Helms*, 452 U.S. 412, 419, (1981) ("Despite the fundamental nature of this right, there nonetheless are situations in which a State may prevent a citizen from leaving. Most obvious is the case in which a person has been convicted of a crime within a State. He may be detained within that State, and returned to it if he is found in another State."); *Castaneira v. Potteiger*, 621 F. App'x 116, 119 (3d Cir. 2015) ("[B]ecause [the plaintiff], as a parolee[,] does not enjoy an absolute right to travel, his substantive due process claim failed as a matter of law."); *see also United States v. Williams*, 15 F.3d 1356, 1359 n.3 (6th Cir. 1994) ("A paroled convict is still, as a matter of law, 'in custody,' and continues to serve the "custodial term" of his or her sentence. Parole does not 'free' a convict."). Whether that broad flexibility is sufficient to permit restrictions such as these, however, is ultimately not before the court, because, as the court has held, Doe's Complaint does not state any claim arising out of parole-based travel restrictions, only travel restrictions arising directly out of the Act.[10]

The Act itself, however, does not restrict interstate travel at all—only international travel. *See Jackson v. Rausch*, No. 3:19-CV-377, 2020 WL 7496528, at *5 (E.D. Tenn. Dec. 21, 2020) ("[T]he travel reporting requirements of Tenn. Code Ann. § 40-39-204(h) only apply to international travel. . . . [I]nternational travel, as opposed to interstate travel, is not a fundamental constitutional right . . . ."). The fact that a violation does not appear on the face of the Act would not necessarily be fatal to Doe's claim, because the defendants' agencies also make discretionary decisions through the exercise of their power under the Act, and those decisions themselves might amount to violations. Discovery, however, has not uncovered any usage of the TDOC's,

_____

[10] The court notes that the fact that Doe's inclusion on the registry is being held to be unconstitutional for entirely distinct reasons would make it especially ill-advised to try to stretch his other claims beyond their natural language to encompass difficult issues involving parole itself.

40

TBI's, or other agency's power *under the Act* to impose interstate travel restrictions. Rather, the facts show that the only restrictions that might fall within the substantive scope of the constitutional right to interstate travel were imposed solely as parole conditions.

TDOC may have imposed those conditions based on its knowledge of Doe's registry status, but that fact implicates only TDOC's internal decisionmaking process; it does not change the source of TDOC's authority. The conditions themselves are, as a legal matter, purely creatures of parole and therefore outside the scope of Count IV as pleaded. The defendants are therefore entitled to summary judgment as to that count.

**D. Count V: Right to Participate in the Upbringing of One's Children**

Count V is based on the Act's interference with Doe's "right to direct the education and upbringing of [his] children." (Doc. No. 1 ¶ 123.) The Supreme Court has, for many decades, recognized that "fundamental rights and liberty interests" entitled to a heightened level of constitutional protection include not only "the specific freedoms protected by the Bill of Rights," but also, among other things, the rights to marry, have children, and direct the education and upbringing of those children. *Washington v. Glucksberg*, 521 U.S. 702, 720 (1997) (listing cases); *see Skinner v. State of Okl. ex rel. Williamson*, 316 U.S. 535, 541 (1942) ("Marriage and procreation are fundamental to the very existence and survival of the race. . . . We mention these matters not to reexamine the scope of the police power of the States. We advert to them merely in emphasis of our view that strict scrutiny of the classification which a State makes in a sterilization law is essential, lest unwittingly or otherwise invidious discriminations are made against groups or types of individuals in violation of the constitutional guaranty of just and equal laws."). Doe argues that the Act has interfered in his constitutionally protected parental rights through its restrictions on his ability to attend and engage in school functions, as well as the

travel restrictions that allegedly have prevented him from participating fully in the life of his out-of-state daughter.

It is not difficult to see how a hypothetical, robust constitutional right to direct the upbringing of one's children might be implicated by the restrictions of the Act. The actual version of that right recognized by existing caselaw, however, is considerably narrower and has chiefly focused on a parent's involvement in major decisions such as where and if the child should to go to school or on whether a parent can have meaningful direct contact with his child at all. *See, e.g.*, *Pierce v. Soc'y of the Sisters of the Holy Names of Jesus & Mary*, 268 U.S. 510, 534 (1925); *Schulkers v. Kammer*, 955 F.3d 520, 541 (6th Cir. 2020). Doe has been unable to identify any caselaw finding a constitutional violation based on the government's interference in discrete, everyday matters such as attending school events, and, insofar as there is caselaw on similar topics, the courts have been skeptical of such claims. *See, e.g., Bailey v. Virginia High Sch. League, Inc.*, 488 F. App'x 714, 716 (4th Cir. 2012) (holding that parents' "right to control individual components of their son's education . . . is not constitutionally protected"); *cf. Seger v. Kentucky High Sch. Athletic Ass'n*, 453 F. App'x 630, 634 (6th Cir. 2011) ("The fundamental right of parents to control the education of their children does not extend to a right to demand that their children be allowed to participate without restrictions in extracurricular sports in the educational setting that the parents have freely chosen.").

That, of course, does not mean that those aspects of parenting are unimportant. They simply have not been recognized as entitled to a heightened level of constitutional protection. The Supreme Court's caselaw confirms that, "[i]n the vast majority of cases, state law determines the final outcome" of parenting-based legal disputes. *Lehr v. Robertson*, 463 U.S. 248, 256 (1983). As a practical matter, the court notes that governments routinely play a role in

the details of day-to-day parenting through the ordinary operation of the family law, education, and child welfare systems, and aggressively constitutionalizing every aspect of those relationships would, in fact, be quite a heavy lift for both the courts and the Constitution. In any event, if there were any basis for expanding the rights specifically associated with parenting under the Constitution in this case, then that path was surely foreclosed by the Supreme Court's recent jurisprudence, which has been markedly critical of such rights unless shown to be "'deeply rooted' . . . in this Nation's history and tradition." *Dobbs v. Jackson Women's Health Org.*, 142 S. Ct. 2228, 2260 (2022).

Doe's limited briefing of this issue does not come close to establishing the kind of historical and/or jurisprudential pedigree that would justify adopting a novel theory of constitutional violation of parental rights under current caselaw. The evidence that he has presented, moreover, does not establish that the obstacles and needs inherent in his particular family situation would provide the basis for finding a narrower, more exceptional type of individualized violation. The defendants are therefore entitled to summary judgment as to Count V.

**E. Remedies**

Doe seeks declaratory relief and a permanent injunction ensuring that he remains off the registry, and the defendants have not advanced any argument against either remedy. Based on the foregoing, the court finds that Doe is entitled to a permanent injunction for largely the same reasons he was entitled to a preliminary injunction based on his high likelihood of success on the merits. *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 546 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.");

*accord First Choice Chiropractic, LLC v. DeWine*, No. 1:19-CV-2010, 2020 WL 42355, at *2 (N.D. Ohio Jan. 3, 2020). Adding declaratory relief on top of such an injunction may appear, at first, redundant, but the parole-related complexities associated with this case make it particularly important that the court be as clear as possible regarding what it is holding, and the court sees no legal basis for denying such relief. *See United Specialty Ins. Co. v. Cole's Place, Inc.*, 936 F.3d 386, 396 (6th Cir. 2019) (discussing factors governing appropriateness of declaratory relief). The court accordingly will award both forms of relief.

As for the scope of the permanent injunction, the court will, for the most part, simply convert the terms of the preliminary injunction into permanent relief. Some requirements of that injunction are now unnecessary, given that Doe has already been removed from the registry, but the court will permanently extend the defendants' ongoing obligations to (1) refrain from applying the Act to Doe and (2) take such steps as are reasonably necessary to ensure that other officials do not inadvertently treat him as still on the registry.

The court will vacate its clarifying Order regarding how Doe's parole will be managed. That Order, as it stated, was intended only to provide "guardrails" in light of the defendants' early mistakes in effecting the preliminary injunction (Doc. No. 56 at 8), and there is currently no evidence that such guardrails are necessary in perpetuity. The court, moreover, is hesitant to interfere in Tennessee's internal division of administrative responsibilities without a firm basis in law, and Doe's success on Count I does not support permanent federal court oversight of how Doe's parole will be managed. As long as the defendants remain subject to the court's permanent injunction, however, the court will "retain[] jurisdiction for the purpose of implementing and enforcing the final judgment and any additional orders necessary and appropriate to the public interest." *United States v. ITS Fin., LLC*, 592 F. App'x 387, 398 (6th Cir. 2014) (quotation

omitted). Accordingly, if any confusion or disagreement arises regarding whether the defendants have taken sufficient efforts to comply with the permanent injunction, the court may consider any such issues and revise or clarify the relief granted as necessary.

## V. CONCLUSION

For the foregoing reasons, Doe's Motion for Summary Judgment (Doc. No. 58) will be granted as to Count I, and the defendants' Motion for Summary Judgment (Doc. No. 70) will be granted as to Counts III, IV, and V.

An appropriate order will enter.

ALETA A. TRAUGER
United States District Judge